# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-1501 and 11-1523

NORMAN W. BERNSTEIN, et al.,

*Plaintiffs-Appellants/Cross-Appellees,*

*v.*

PATRICIA A. BANKERT, et al.,

*Defendants-Appellees,*

AND

AUTO OWNERS MUTUAL INSURANCE COMPANY,

*Defendant-Appellee/Cross-Appellant.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-00427—**Richard L. Young**, *Chief Judge.*

ARGUED OCTOBER 31, 2011
DECIDED DECEMBER 19, 2012
AMENDED JULY 31, 2013[1]

---

[1] Judges Flaum, Tinder, and Hamilton did not participate in the consideration of the request for rehearing.

Before KANNE and WILLIAMS, *Circuit Judges*, and DEGUILIO, *District Judge.*[2]

DEGUILIO, *District Judge.* This appeal is the latest chapter in the story of the Environmental Chemical and Conservation Company ("Enviro-Chem"), a defunct Indiana corporation with an expensive environmental legacy. Enviro-Chem conducted waste-handling and disposal operations at three sites north of Zionsville, Indiana, until it closed its doors in the early 1980s, and it left considerable amounts of pollutants behind. The plaintiffs in this action are the trustees of a fund created to finance and oversee the cleanup project at one of those three sites. The defendants are the former owners of the site, their corporate entities (including Enviro-Chem), and their insurers, none of whom have paid into the trust despite an alleged obligation to do so. The plaintiffs sued to recover cleanup costs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), the Indiana Environmental Legal Actions Statute ("ELA"), and more. The district court dismissed all claims at the summary judgment stage, and the plaintiffs appealed. In response, one of the insurance companies targeted by the plaintiffs filed a conditional cross-appeal, hoping to preserve a favorable outcome even in the event of a reversal of the district court's final judgment.

---

[2] The Honorable Jon E. DeGuilio, Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

On December 19, 2012, this panel decided both appeals, affirming in part and reversing in part the district court decision and remanding the case for further proceedings on the reinstated claims. *Bernstein v. Bankert*, 702 F.3d 964 (7th Cir. 2012). The defendants-appellees requested a panel rehearing, and the Environmental Protection Agency joined their request as *amicus curiae*. While we conclude that the arguments advanced by the parties do not warrant reconsideration of our decision, we grant rehearing, in part, to address some issues raised by the EPA. Specifically, the EPA identified certain passages of our original opinion which suggested that a party may *never* structure a settlement agreement with the EPA in such a way as to resolve their liability immediately upon execution of that agreement. That is not the case. A party responsible for an instance of environmental contamination may obtain an immediately effective release from the EPA in a settlement, or it may obtain only a performance-dependent conditional covenant not to sue with an accompanying disclaimer of any liability. Whether, and when, a given settlement "resolves" a party's liability to the EPA within the meaning of 42 U.S.C. § 9613(f)(3)(B) is ultimately a case-specific question dependant on the terms of the settlement before the court. In this case, the terms of the administrative settlement did not provide for a resolution upon entering into the agreement. The following constitutes this panel's amended opinion superseding our prior opinion and resolving the appeals in both Nos. 11-1501 and 11-1523.

## BACKGROUND

The appellants—plaintiffs below—are the trustees of the Third Site Trust Fund ("Trustees"). Third Site is a CERCLA site located about five miles north of Zionsville, Indiana. Along with two other CERCLA sites in close proximity—the Enviro-Chem Site to the north and the Northside Sanitary Landfill ("NSL") to the northeast— Third Site was owned and operated by the Bankert family and their corporate entities at all times relevant to this litigation. Up until the early 1980s, Enviro-Chem, one of those entities, was engaged in brokering and recycling industrial and commercial wastes at all three sites. It is undisputed that Enviro-Chem's operations extended to Third Site; historical aerial photographs depict Third Site being used for tank and drum storage, and former Enviro-Chem employees have indicated that Third Site hosted waste handling and disposal operations.

Enviro-Chem ceased operations in 1982, and shortly thereafter the United States Environmental Protection Agency ("EPA") undertook an extended effort to clean up the mess it left behind. The cleanup initially focused on the Enviro-Chem Site and the NSL, but in 1987 and 1992 consultants collected soil, groundwater, seepage soil and seepage water samples from Third Site. The samples indicated elevated concentrations of volatile organic compounds ("VOCs") and semi-volatile organic compounds ("SVOCs") in the areas tested. Similarly, surface water samples collected by the EPA in 1988 from nearby Finley Creek showed elevated levels of VOCs

immediately adjacent to and downstream from Third Site. These results were consistent with additional samples collected in 1985 and 1986 from surface seeps discharging from Third Site and into Finley Creek. In short, Third Site was polluted, and it was transferring its pollutants to Finley Creek. Finley Creek flows south into Eagle Creek Reservoir, and Eagle Creek Reservoir supplies a portion of the drinking water for the City of Indianapolis. The pollution of Finley Creek was therefore cause for real concern.

In 1996, the EPA countered the threat by issuing a Unilateral Administrative Order ("UAO") outlining a plan to realign Finley Creek. The plan called for eliminating an oxbow, the top of which touched areas of high contamination at Third Site, and for rerouting the creek away from the site and to the south. The re-alignment project was designated a time-critical removal project, and the respondents to the UAO completed it in September 1996. Subject to periodic maintenance inspections, the EPA approved their performance.

Having averted any significant corruption of the drinking water supply, the EPA turned its attention to cleaning up Third Site itself. In October 1999, the EPA entered into an Administrative Order by Consent ("AOC") with a number of respondents, each of whom was designated a potentially responsible party ("PRP") for contamination at the site. The 1999 AOC was divided into two separate parts: one dealing with "Non-Premium Respondents" and one dealing with "Premium Respondents." The Non-Premium Respondents agreed to under-

take an Engineering Evaluation and Cost Analysis ("EE/CA") of removal alternatives for Third Site. They also agreed to settle a trust—the Third Site Trust, of which the appellants are Trustees—and to fund it to the extent necessary to bankroll the EE/CA and any additional necessary work. Through the Trust, they would reimburse the EPA for past response and over-sight costs as well as future oversight costs incurred in conjunction with the EE/CA project. The Premium Respondents, on the other hand, were alleged to be *de minimis* contributors to the contamination at Third Site. They were entitled to settle out with a defined, one-time monetary contribution to the Trust consistent with 42 U.S.C. § 9622(g).

The Non-Premium Respondents met their obligations under the 1999 AOC and obtained EPA approval of the final EE/CA report on October 24, 2000. No copy of the EPA notice of approval was included in the record, and we only know of it through affidavits submitted with the parties' summary judgment briefs. But, in any case, the parties do not dispute that the 1999 AOC was complied with fully to its completion. In 2001, sub-sequent to approving the work done under the 1999 AOC, the EPA issued an Enforcement Action Memoran-dum selecting one of the removal actions for the site identified by the EE/AC and outlining cleanup objectives.

In November 2002, the parties entered into a second AOC to perform the work called for by the Enforcement Action Memorandum. For the most part, the 2002 AOC tracked the form of the 1999 AOC. It included separate

provisions addressing the responsibilities of Premium and Non-Premium Respondents and contained the same reservation of rights and conditional covenants not to sue. Furthermore, the Non-Premium respondents maintained the same responsibilities *vis-a-vis* the Trust, which was once again assigned to manage the removal effort. At the time this lawsuit was filed, the work to be performed under the 2002 AOC was still ongoing, and no EPA notice of approval had issued.

Under the terms of the 1999 and 2002 AOCs and the corresponding Trust Agreement, the Trustees are empowered to hold and manage funds; to retain engineers and others to carry out the work to be performed under the AOCs; to project future costs; to obtain additional funds as needed from the settlors (i.e., the Non-Premium Respondents); and, subject to prior approval, to bring suit against those who do not meet their obligations to the Trust. The Bankert appellees[3] were listed as Non-Premium Respondents under the 1999 and 2002 AOCs, but have not met their obligations by paying into the Trust or otherwise.

On April 1, 2008, the Trustees filed a Complaint against the Bankerts and their various insurers in the Southern District of Indiana with six counts: Count I, a CERCLA cost recovery action pursuant to 42 U.S.C.

---

[3] We use "the Bankerts" to refer collectively to Patricia A. Bankert, both individually and in her capacity as personal representative of the estate of Jonathan W. Bankert, Sr.; Jonathan W. Bankert, Jr.; Gregory Bankert; and Enviro-Chem.

§ 9607(a); Count II, seeking a declaratory judgment under CERCLA of the defendants' joint and several liability; Count III, a cost recovery action under the ELA, codified at I.C. § 13-30-9-2; Count IV, negligence; Count V, nuisance; and Count VII,[4] seeking a declaratory judgment of coverage against the insurers.

On May 30, 2008, one of the Bankerts' former insurers, Auto Owners Mutual Insurance Company ("Auto Owners"), moved to dismiss the Trustees' Complaint against it pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(d). The coverage provisions of Auto Owners's policies with the Bankerts were previously litigated in connection with cleanup efforts at the Enviro-Chem Site in the 1980s, and Auto Owners argued that the favorable judgment it obtained in that case precluded a finding of coverage in this case. On September 17, 2008, the district court converted the portion of Auto Owners's motion claiming preclusion to a motion for summary judgment and permitted the parties to conduct discovery and submit additional briefing. On March 16, 2010, the district court entered an order denying the motion.

On September 22, 2009, the Bankerts moved for summary judgment on statute of limitations grounds. The Trustees responded, and the Bankerts replied. On December 10, 2009, the Trustees moved to strike a portion of that reply or, in the alternative, for permission to file supplemental briefing. The district court heard

---

[4] For reasons unknown to us, the Complaint did not include a "Count VI."

oral argument on August 3, 2010. On September 29, 2010, the district court denied the Trustees' motion to strike and granted summary judgment in the Bankerts' favor. First, the district court found that the Trustees could not bring a CERCLA cost recovery claim under 42 U.S.C. § 9607(a), which is what Count I of the Complaint purported to do. Instead, the district court construed the Trustees' CERCLA claim as one for contribution pursuant to 42 U.S.C. § 9613(f). Next, the district court found that the statute of limitations applicable to *that* kind of CERCLA claim had run. This, in turn, invalidated the declaratory judgment request contained in Count II. Finally, the district court found that the statute of limitations had run with respect to each of the Trustees' state law claims against the Bankerts. Counts I through V were dismissed.

Next, the district court asked the parties to report on the status of Count VII, which sought a declaratory judgment of coverage against Auto Owners and the other insurers. All parties conceded that it was moot; insurance coverage was a non-issue without a controversy over the underlying liability. On October 13, 2010, the Trustees moved the court to reconsider the grant of summary judgment with respect to the ELA claim and to certify the question to the Indiana Supreme Court. On February 3, 2011, the district court denied that motion and entered final judgment in favor of the defendants, dismissing Count VII as moot consistent with the parties' positions. The Trustees filed a timely notice of appeal on March 3, 2011, and Auto Owners cross-appealed. We take up each appeal in turn.

**THE TRUSTEES' APPEAL**

The Trustees appeal the district court's dismissal at the summary judgment stage of their CERCLA and ELA claims, as well as the dismissal of their declaratory judgment claim against Auto Owners. They also appeal the district court's denial of their motion to strike a portion of the Bankerts' summary judgment reply. They have not appealed the district court's dismissal of their state law negligence and nuisance claims, and as a result those claims are lost. We find that the Trustees have, in fact, pled a timely CERCLA cost recovery claim, although the scope of their recovery will be limited. As a result, Counts I and II must be reinstated. Count III, claiming contribution under the Indiana ELA, is timely as well. Reinstating those claims means there is a live controversy over liability, and so we must reverse the district court's dismissal of Count VII as moot.

## I. Counts I and II: CERCLA Claims

In Count I of their Complaint, the Trustees seek to recover funds which the Bankerts allegedly owe to the Third Site Trust pursuant to obligations created by the 1999 and 2002 AOCs. The Trustees characterize Count I as a claim for cost recovery under 42 U.S.C. § 9607(a), but the district court held: (1) that a § 9607(a) claim was unavailable to the Trustees; (2) that their claim must therefore be one for contribution under § 9613(f); and (3) that the limitations period for a contribution claim had run. Count II, seeking a declaratory judgment of liability, is essentially a derivative claim; once the

district court concluded that Count I was not timely, Count II had to be dismissed as well.

We review a district court's grant of summary judgment based on a statute of limitations de novo. *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004). To the extent we are called upon to review the district court's interpretation of the statute, the standard of review is likewise de novo. *Storie v. Randy's Auto Sales LLC*, 589 F.3d 873, 876 (7th Cir. 2009). We are mindful, too, of the deference typically accorded to the summary judgment non-movant with respect to the resolution of factual issues, but note that this dispute is almost entirely a legal one, with the underlying facts undisputed: the Bankerts argue that the Trustees have advanced one type of CERCLA claim, and that it is barred by the statute of limitations; the Trustees argue that they have advanced another type of claim, and that it is not. They are both partially correct, but the net result is that the district court must be reversed with respect to Count I. That, in turn, is enough to revive Count II. Finally, we find no abuse of discretion in the district court's denial of the Trustees' motion to strike portions of the Bankerts' summary judgment reply.

## A. CERCLA and SARA Statutory Scheme

In 1980, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675, in response to the serious environmental and health risks posed by industrial pollution. *Burlington Northern and Santa Fe Ry. Co. v. United States*,

556 U.S. 599, 602 (2009) (citing *United States v. Bestfoods*, 524 U.S. 51, 55 (1998)). CERCLA is not known for its clarity, or for its brevity. *Exxon Corp. v. Hunt*, 475 U.S. 355, 363 (1986) (noting CERCLA provisions are "not . . . model[s] of legislative draftsmanship," and its statutory language is "at best inartful and at worst redundant"). But its purpose, at least, is straightforward: the act was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination. *Burlington Northern*, 556 U.S. at 602 (citing *Consol. Edison Co. of N.Y. v. UGI Util., Inc.*, 423 F.3d 90, 94 (2d Cir. 2005)); *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 n. 13 (1994) ("CERCLA is designed to encourage private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others."). Relevant to this case, two CERCLA sections—42 U.S.C. §§ 9607(a) and 9613(f)—afford rights of action to private parties seeking to recover expenses associated with cleaning up contaminated sites. Actions under § 9607(a) and § 9613(f) are governed by different statutes of limitation, and we must decide under which section the Trustees' CERCLA claim falls before determining whether it is time-barred.

42 U.S.C. § 9607(a), the first of the two sections in question, is the "cost recovery" provision of CERCLA. It identifies four categories of potentially responsible parties relative to any instance of contamination based on their relationship to the contaminated site. *See* § 9607(a)(1)-(4). When a release or threatened release of hazardous substances occurs, the PRPs are strictly

liable for "all costs of removal or remedial action[5] incurred by the United States Government or a State or

---

[5] The terms "removal action" and "remedial action" represent the two primary forms of response contemplated by CERCLA:

> (23) The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.
>
> * * *
>
> (24) The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(23)-(24). Practically speaking, "removal actions are 'those taken to counter imminent and substantial threats to public health and welfare,' while remedial actions 'are longer term, more permanent responses.'" *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 608 (8th Cir. 2011) (quoting *Minnesota v. Kalman W. Abrams Metals, Inc.*, 155 F.3d 1019, 1024 (8th Cir. 1998)).

an Indian tribe not inconsistent with the national con-
tingency plan[,][6]" § 9607(a)(4)(A), as well as for "any
other necessary costs of response incurred by any
other person consistent with the national contingency
plan." § 9607(a)(4)(B). The phrase "any other person," as
used in § 9607(a)(4)(B), has been read literally to mean
*any* person other than the United States, a State, or an
Indian tribe—in other words, any person other than
the entities listed in subpart (A). *See United States v. Atl.
Research Corp.*, 551 U.S. 128 (2007). Thus, § 9607(a)(4)(B)
grants one PRP the same rights as an innocent party to
sue another PRP for cleanup costs incurred in a
removal or remedial action. *Id*. In such cases, the defen-
dant's liability—although strict—need not be joint and
several. *See Burlington Northern*, 556 U.S. at 613-14.
Judicial apportionment is proper so long as the
defendant can demonstrate that there is a reasonable
basis for determining the contribution of each cause to a
single harm. *Id*. (citing *United States v. Chem-Dyne Corp.*,
572 F.Supp. 802, 810 (S.D. Ohio 1983); RESTATEMENT
(SECOND) OF TORTS § 433A(1)(b), p. 434 (1963-1964)).

42 U.S.C. § 9613(f), on the other hand, is the "contribu-
tion" provision of CERCLA. Added to the statute by
the Superfund Amendments and Reauthorization Act

---

[6] "The national contingency plan specifies procedures
for preparing and responding to contaminations and was
promulgated by the Environmental Protection Agency[.]"
*United States v. Atl. Research Corp.*, 551 U.S. 128, 135 n. 3 (2007)
(citing *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 161 n.
2 (2004)); *see also* 40 C.F.R. § 300.1 *et seq*.

of 1986 ("SARA"), it creates two distinct rights to contribution, each subject to its own prerequisites. The first is codified at 42 U.S.C. § 9613(f)(1):

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, *during or following any civil action under section 9606 of this title or under section 9607(a) of this title*.

(emphasis added). In *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004), the Supreme Court held that the italicized phrase has a limiting effect. "The natural meaning of this sentence is that the contribution may *only* be sought subject to the specified conditions[.]" *Id.* at 166 (emphasis added). To read the clause more expansively would render the italicized phrase superfluous, which the Court was loathe to do. *Id.* (citing *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). In short, "[t]here is no reason why congress would bother to specify conditions under which a person may bring a contribution claim, and at the same time allow contribution actions absent those conditions." *Id.* After *Cooper*, a contribution action under 42 U.S.C. § 9613(f)(1) *must* be pre-dated by the filing of a civil action pursuant to § 9606 or § 9607(a).

The second contribution right of action is codified at 42 U.S.C. § 9613(f)(3)(B):[7]

---

[7] One could reasonably conclude, based solely on the physical structure of § 9613(f), that § 9613(f)(3)(B) does not create a distinct, second cause of action for contribution, instead

(continued...)

> A person *who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement* may seek contribution from any person who is not party to a settlement referred to in paragraph (2).[8]

(emphasis added). As the Supreme Court did with respect to § 113(f)(1), *supra*, we read the italicized phrase as a limiting provision: a § 9613(f)(3)(B) contribution claim is *only* available to a person who has "resolved its liability . . . in an administrative or judicially approved settlement." *See also Consol. Edison Co.*, 423 F.3d at 95 (holding that the resolution of CERCLA liability is a prerequisite to a § 9613(f)(3)(B) contribution action). To

---

[7] (...continued)

simply modifying or further describing the conditions under which a § 9613(f)(1) contribution action might be available. But the Supreme Court has foreclosed that reading. *See Cooper*, 543 U.S. at 163 ("SARA also created a separate express right of contribution, § 113(f)(3)(B) . . .").

[8] "Paragraph (2)" is CERCLA's "contribution bar" provision, stating:

> A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement. 42 U.S.C. § 9613(f)(2).

read the section as affording the same remedy to one who has *not* resolved his liability would be nonsensical, and it would render the limiting language superfluous. The Supreme Court has long insisted that result should be avoided wherever possible. *See Cooper*, 543 U.S. at 166; *United States v. Nordic Village, Inc.*, 503 U.S. 30, 35-36 (1992) (referencing the "settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect."); *Louisville & Nashville R. Co. v. Mottley*, 219 U.S. 467, 475 (1911) ("We must have regard to all the words used by Congress, and as far as possible give effect to them.").

In summary, each CERCLA right of action carries with it its own statutory trigger, and each is a distinct remedy available to persons in different procedural circumstances. *See Atl. Research*, 551 U.S. at 139 (citing *Consol. Edison Co.*, 423 F.3d at 99); *see also Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 122 (2d Cir. 2010). Where a person has been subjected to a civil action under 42 U.S.C. §§ 9606 or 9607(a), he may attempt to recover his expenditures through a contribution suit under 42 U.S.C. § 9613(f)(1). Where a person has resolved his liability to the United States, or to a state, for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement, he may attempt to recover his expenditures in a contribution suit pursuant to 42 U.S.C. § 9613(f)(3)(B). If neither of those triggers has occurred, a plaintiff does not have a claim for contribution under CERCLA. That does not mean he has no remedy, however. Any time a person has incurred "neces-

sary costs of response . . . consistent with the national contingency plan[,]" CERCLA provides for a § 9607(a)(4)(B) cost recovery action. These are the plain terms of the statute.

## B.   Classifying the Trustees' CERCLA Claim

The next step is to apply the statutory scheme to the facts to determine which sort of claim, or claims, the Trustees have advanced, and whether it is barred by the applicable statute of limitations. In Count I of the Complaint, the Trustees seek to recover the costs they incurred pursuant to the 1999 and 2002 AOCs. In order to determine which kind of CERCLA claim Count I states, we must take a closer look at the undisputed documentary evidence presented, particularly the AOCs themselves. In doing so, we find that the Trustees have stated a cost recovery claim under § 9607(a), but only with respect to costs incurred pursuant to the 2002 AOC. At this point, costs incurred pursuant to the 1999 AOC could only be recovered through a contribution claim, which is time-barred.

### 1.   The 1999 AOC

Under the 1999 AOC, the Non-Premium Respondents took on significant responsibilities. They agreed to undertake the EE/CA study of removal alternatives for Third

Site, to develop and submit an EE/CA report to the EPA,[9] and to settle and fund the Third Site Trust. They also agreed to reimburse the federal government for the EPA's past response and oversight costs, for any future oversight costs incurred in conjunction with the EE/CA project, and for an amount certain to be expended by the Department of the Interior in addressing natural resource damages at Third Site. The 1999 AOC laid out deadlines for the Non-Premium Respondents to meet their obligations, and made clear that no release from CERCLA liability would occur until those obligations were met:

> Except as expressly provided in Section XIII (Covenant Not to Sue), nothing in this Order constitutes a satisfaction of or release from any claim or cause of action against the Respondents or any person not a party to this Order, for any liability such person may have under CERCLA, other statutes, or the common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106(a) or 107(a) or CERCLA, 42 U.S.C. §§ 9606(a), 9607(a).[10]

---

[9] An EE/CA is classified as a "removal action" by the EPA. *See* 40 C.F.R. § 300.415(b)(4)(i).

[10] Both the case law and the administrative materials addressing CERCLA frequently switch back and forth between referring to sections of the act by their section number, as enacted, and their section number, as codified. "Section 107(a)"

(continued...)

The covenants not to sue referred to in the disclaimer above were expressly conditioned on the Respondents' fulfillment of their obligations under the Order:

> Except as otherwise specifically provided in this Order, upon issuance of the [Notice of Completion], U.S. EPA covenants not to sue Respondents for judicial imposition of damages or civil penalties or to take administrative action against Respondents for any failure to perform actions agreed to in this Order[.]
>
> * * *
>
> [I]n consideration and upon Respondents' payment of [the EPA's response costs], U.S EPA covenants not to sue or take administrative action against Respondents under Section 107(a) of CERCLA[.]

And, most explicitly, as modified by the attached errata sheet:

> These covenants are conditioned upon the complete and satisfactory performance by Respondents of their obligations under this Order.

Moreover, just as the EPA refused to give up its rights to sue the Respondents, the Respondents refused to consider the Order to be an admission of liability on their part:

---

[10] (...continued)
of CERCLA, for example, was codified at 42 U.S.C. § 9607(a); "Section 113(f)" corresponds to § 9613(f), etc. For ease of reference, we refer to CERCLA sections by their designation within the United States Code.

Respondents' agreement to comply with and be bound by the terms of this Order and not to contest the basis or validity of this Order or its terms shall not constitute any admission of liability by any (or all) of the Respondents nor any admission by Respondents of the basis or validity of U.S. EPA's findings, conclusions or determinations contained in this Order.

Under the plain language of the AOC, with respect to the Non-Premium Respondents, the EPA's covenants not to sue—and the accompanying release from CERCLA liability—would take effect when they had seen the EE/AC project through to its completion and provided the Trust with sufficient funds to meet its monetary commitments pursuant to the AOC, and no sooner. It is undisputed that the Non-Premium Respondents did meet those obligations, as the EPA approved their performance of the 1999 AOC on October 24, 2000.

### a.  The Trustees have a § 9613(f)(3)(B) contribution claim for costs incurred under the 1999 AOC.

By the terms of the AOC, when the Non-Premium Respondents completed performance of their obligations under the 1999 AOC and obtained a notice of approval from the EPA, the conditional covenants not to sue contained therein went into effect. At that point, the Non-Premium Respondents, and by extension the Trust, had "resolved [their] liability to the United States . . . for some or all of a response action or for some or all of the costs of such action" through an administrative settlement,

thus satisfying the prerequisites for a contribution action pursuant to 42 U.S.C. § 9613(f)(3)(B). Specifically, the Trust had resolved its liability to the United States with respect to the execution of the EE/CA and with respect to the reimbursement of government response and oversight costs incurred prior to and in conjunction with the EE/CA project. As a result, they were entitled to recover the costs they incurred in accomplishing those tasks through a contribution action.

Of course, the Trustees also incurred necessary costs of response consistent with the national contingency plan. They did not simply reimburse the EPA for a removal action it had already performed; they funded and executed the removal action themselves. In that sense, the trigger for a § 9607(a) cost recovery action was also met. This brings us to one of the questions raised in the briefs: are there any circumstances under which a plaintiff may bring both a cost recovery *and* a contribution claim under CERCLA? The Supreme Court left that possibility open in *Atlantic Research*:

> We do not suggest that §§ 107(a)(4)(B) and 113(f) have no overlap at all. *Key Tronic Corp. v. United States*, 511 U.S. 809, 816, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994) (stating the statutes provide "similar and somewhat overlapping remed[ies]"). For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a). *See, e.g., United Technologies Corp. v. Browning-Ferris Industries, Inc.*, 33 F.3d 96, 97 (1st Cir. 1994). In such a case, the PRP does not incur costs voluntarily but

> does not reimburse the costs of another party. We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both.

551 U.S. at 139 n. 6.

Most circuits, after *Atlantic Research*, have not allowed a plaintiff to pursue a cost recovery claim when a contribution claim is available. *See Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1236-37 (11th Cir. 2012); *Morrison Enters., LLC v. Dravo Corp.*, 638 F.3d 594, 603 (8th Cir. 2011); *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 291 n. 19 (5th Cir. 2010) (acknowledging, and not disturbing, district court's implicit decision that plaintiff could not pursue both remedies); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 229 (3d Cir. 2010); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 128 (2d Cir. 2010); *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 458 (6th Cir. 2007). Two justifications are usually given for reaching that conclusion. First, courts have noted that, despite its passing acknowledgment of a possible overlap in *Atlantic Research*, the Supreme Court has repeatedly emphasized the procedural "distinctness" of the CERCLA rights of action. *See, e.g.*, 551 U.S. at 138; *Niagara Mohawk*, 596 F.3d at 128; *ITT Indus.*, 506 F.3d at 458. Second, some courts have concluded that permitting a party who has already resolved his own liability through a settlement to pursue a § 9607(a)(4)(B) action would allow him to exploit CERCLA's "contribution bar" provision to shift full liability onto the target of his suit, a result antithetical to the purpose of the statute. *See, e.g., Solutia*, 672 F.3d at 1237; *Agere Sys., Inc.*, 602 F.3d at 228-229.

The "contribution bar" argument, although common in the case law, is based on a faulty premise. The argument is that a § 9607(a) cost recovery suit imposes joint and several liability on its target, whereas a contribution defendant only faces equitable apportionment. At the same time, pursuant to § 9613(f)(2), a party who has "resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." Several courts have concluded that allowing a party who has resolved its liability through settlement—and who thus meets the prerequisites for a § 9613(f)(3)(B) contribution action, as well as for protection under § 9613(f)(2)—to pursue a cost recovery action instead would allow that party to impose joint and several liability on a defendant without any fear of a counterclaim, due to the operation of § 9613(f)(2). *Solutia*, 672 F.3d at 1237; *Agere Sys., Inc.*, 602 F.3d at 228-229. Theoretically, one PRP could shift full liability onto another PRP and escape all liability himself. Given that CERCLA is intended to distribute the costs of environmental correction among all of those who bear responsibility for an instance of contamination, *see Burlington Northern*, 556 U.S. at 602, such gamesmanship seems inappropriate.

The problem, of course, is that § 9607(a) does not always impose joint and several liability. Apportionment is proper on a cost recovery claim where there is a reasonable basis for determining the contribution of each cause to a single harm. *Burlington Northern*, 556 U.S. at 614. Apportionment is likewise the remedy for a con-

tribution claim. As a result, counterclaim or no counter-claim, there is not more risk that a defendant could be gamed into shouldering full liability, or more than his fair share, by a plaintiff with a § 9607(a) cost recovery action than by a plaintiff with a § 9613(f)(3)(B) contribution action. After *Burlington Northern*, the "contri-bution bar" argument is not persuasive.

The other justification usually offered for limiting a plaintiff to one form of CERCLA action—the procedural distinctness of the remedies—is more compelling. As the Second Circuit has observed, "[t]o allow [a qualifying contribution plaintiff] to proceed under § 9607(a) would in effect nullify the SARA amendment and abrogate the requirements Congress placed on contribution claims under § 9613." *Niagara Mohawk*, 594 F.3d at 128. "'When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and sub-stantial effect.'" *Id*. (citing *Stone v. INS*, 514 U.S. 386, 397 (1995)). We agree with the sentiments expressed by the Second Circuit. Through SARA, Congress intentionally amended CERCLA to include express rights to contribu-tion, subject to certain prerequisites. If § 9607(a) already provided the rights of action contemplated by the SARA amendments, then the amendments were just so many superfluous words. The canons of statutory construction counsel against any interpretation that leads to that result. *See Hibbs*, 542 U.S. at 101.

In short, with respect to the 1999 AOC, the Trustees have a contribution action under § 9613(f)(3)(B). Although, giving the words their plain meaning, they have

also incurred "necessary costs of response," *see* § 9607(a)(4)(B), as is required to sustain a cost recovery action, we agree with our sister circuits that a plaintiff is limited to a contribution remedy when one is available. The next step is to determine whether the Trustees' recovery, on a contribution theory, for costs incurred pursuant the 1999 AOC is time-barred.

### b. The Trustees are time-barred from recovering costs expended pursuant to the 1999 AOC.

The statute of limitations for CERCLA contribution actions can be found at 42 U.S.C. § 9613(g)(3):

> No action for contribution for any response costs or damages may be commenced more than 3 years after—
>
> > (A) the date of judgment in any action under this chapter for recovery of such costs or damages, or
> >
> > (B) the date of an administrative order under section 9622(g) of this title (relating to *de minimis* settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

The Bankerts argue that because the *de minimis* parties, also known as the Premium Respondents, settled out pursuant to § 9622(g), the three year limitations period

began to run on the date the AOC was executed.[11] The Trustees argue in response that it certainly did with respect to any claims that the *de minimis* parties might advance, but that none of the § 9613(g)(3) triggers have occurred with respect to their own claims. The Trustees argue that their claims fall within a "gap" in the statutory coverage, and that the gap should be filled with the limitations period applicable to actions under U.S.C. § 9607(a). An "initial action for the recovery of costs" under § 9607(a) must be filed:

> (A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and
>
> (B) for a remedial action, within 6 years after initiation of physical on-site construction of the reme-

---

[11] Although the Bankerts failed to raise the issue, an argument can also be made that the 1999 AOC was "an administrative order . . . under § 9622(h)[,]" to the extent that the Non-Premium Respondents agreed to reimburse response costs incurred by the federal government pursuant to that section. That would provide an additional basis for starting the three year clock on the day the AOC was executed. In its *amicus* brief, the EPA suggests that by making note of this potential wrinkle we "addressed" the issue and reached a conclusion that was "incorrect." [EPA *amicus* brief, pp. 12-13). In fact, we neither address it nor reach any conclusion at all; we have relied on it in no way in reaching our decision.

dial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

42 U.S.C. §§ 9613(g)(2)(A)-(B).

We need not resolve the "coverage gap" dispute with respect to the work performed under the 1999 AOC, because the outcome is the same either way. Assuming for the moment that we agree with the Trustees that the limitations period for a cost recovery action should apply, we note that an EE/CA is a "removal action." *See* 40 C.F.R. § 300.415(b)(4)(i). That means that § 9613(g)(2)(A) would apply to any attempt to recover the costs incurred in executing the EE/CA. Under that standard, the limitations period began running when the EE/CA project was completed in October of 2000. The Complaint in this case was filed on April 1, 2008, significantly more than three years later. Recovery is time-barred. Assuming, on the other hand, that we agree with the Bankerts and apply the statute of limitations for contribution actions, we would mark a start date for the limitations period on the date the AOC was executed. Pursuant to § 9613(g)(3)(B), the Trustees had three years from that date—in 1999—in which to file an action. They missed the deadline by approximately six years; recovery is time-barred. Under either party's theory, it is too late for the Trustees to recover the costs they incurred in carrying out the 1999 AOC.

### 2. The 2002 AOC

After approving the work done under the 1999 AOC, the EPA issued an Enforcement Action Memorandum selecting a removal action and cleanup objectives from among the options detailed in the EE/CA. In November 2002, the parties entered into the second AOC to implement those solutions. The 2002 AOC included identical conditional covenants not to sue and an identical disclaimer of liability on the part of the Respondents; its structure was largely parallel to that of the 1999 AOC. To the extent that the Trustees' suit seeks to recover expenses arising out of their performance of the 2002 AOC, it is not a contribution action. The Trustees have been subjected to no civil action under §§ 9606 or 9607, so a contribution action under § 9613(f)(1) is unavailable. On the other hand, under the plain terms of the AOC, they could not have "resolved [their] liability to the United States . . . for some or all of [the work performed under the 2002 AOC] or for some or all of the costs of [the work performed under the 2002 AOC] in an administrative . . . settlement" at any time before satisfactory discharge of their obligations under the 2002 AOC. Since the work to be performed under the 2002 AOC was ongoing when this action was filed, and no notice of approval had issued which would trigger the conditional covenants not to sue, a contribution action under § 9613(f)(3)(B) is likewise unavailable. What the Trustees *have* done, with respect to the work called for by the 2002 AOC, is incur costs of response consistent with the national contingency plan, as is required to file a cost recovery action under § 9607(a).

So, a plain reading of the statute and a sober look at the facts make it clear that a cost recovery action is available. Nonetheless, between the Bankerts and the EPA writing as *amicus* in support of rehearing, three different reasons have been advanced why this court should find that the Trustees are limited to a contribution action for costs incurred pursuant to the 2002 AOC. The first, championed primarily by the Bankerts, is that "compelled" costs incurred pursuant to an AOC must, as a matter of law, be recovered in a contribution action. The second, argued by both parties, is that the mere act of signing a settlement agreement amounts to a resolution of liability for purposes of the statute. The third argument is based on policy considerations and on the theory that withholding a contribution action until liability is actually resolved will discourage future polluters from settling early with the PRP. None of these arguments are factually or legally convincing, and they do not warrant a different result.

### a.  The voluntary/compelled costs dichotomy

The Bankerts' first argument focuses on a distinction between voluntary and compelled costs: they claim that the Supreme Court drew a line in the sand in *Atlantic Research* and that in the current legal environment a cost recovery action is available only to plaintiffs who incurred costs "voluntarily". "Compelled" costs, on the other hand, may only be recovered through a contribution action. Since the Trustees were "compelled" to clean up the site by the administrative settlement

process, the Bankerts argue that they are limited to a contribution action. There are three significant problems with this argument.

The first problem with the Bankerts' argument is that it has no basis in the text of the source case. In *Atlantic Research*, the Court was asked to decide whether the phrase "any other person" in § 9607(a)(4)(B) provides PRPs, in addition to "innocent" parties, with a right to recover response costs from other PRPs. 551 U.S. at 131. Arguing against that result, the United States suggested to the Court that allowing one PRP to maintain a § 9607(a) cost recovery action against another PRP would give it license to "cause shop" between an action for cost recovery and an action for contribution, choosing whichever section offered a perceived advantage under the circumstances of the case.

In response to the government's concern, the Court emphasized the procedural distinctness of the remedies. The Court contrasted a plaintiff who seeks to recover expenditures he himself incurred in cleaning up a site with a plaintiff who seeks to recover the cost of reimbursing another person's expenditures pursuant to a settlement agreement or judgment. 551 U.S. at 139. The former is a typical cost recovery claim, whereas the latter is a typical contribution claim under § 9613(f)(1). *Id*. Under the circumstances as hypothetically defined, the Court saw no room for choosing between the two: "[B]y reimbursing costs paid to other parties, the PRP has not incurred its own costs of response and therefore cannot recover under § 107(a). As a result, though eligible to seek

contribution under § 113(f)(1), the PRP cannot simultaneously seek to recover the same expenses under § 107(a)." *Id*. The Court concluded that the government's cause-shopping worries were thus unfounded. But before moving on, the Court recognized the limitations of its own conceptual illustration in a footnote, which we have quoted once already:

> We do not suggest that §§ 107(a)(4)(B) and 113(f) have no overlap at all. *Key Tronic Corp. v. United States*, 511 U.S. 809, 816, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994) (stating the statutes provide "similar and somewhat overlapping remed[ies]"). For instance, we recognize that a PRP may sustain expenses pursuant to a consent decree following a suit under § 106 or § 107(a). *See, e.g., United Technologies Corp. v. Browning-Ferris Industries, Inc.*, 33 F.3d 96, 97 (1st Cir. 1994). In such a case, the PRP does not incur costs voluntarily but does not reimburse the costs of another party. We do not decide whether these compelled costs of response are recoverable under § 113(f), § 107(a), or both. For our purposes, it suffices to demonstrate that costs incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f). Thus, at a minimum, neither remedy swallows the other, contrary to the Government's argument.

551 U.S. at 139 n. 6.

The Bankerts conclude, based on the quoted footnote, that only parties who voluntarily incur response costs can

bring an action for cost recovery under § 9607(a), and that parties who are "compelled" to incur response costs because of an enforcement action or a government settlement must proceed under § 9613(f) instead. But the Court said "*costs incurred voluntarily* are recoverable *only* by way of [§ 9607(a)(4)(B).]" *Id*. (emphasis added). That is not the same as saying that *only voluntarily incurred costs* are recoverable by way of § 9607(a)(4)(B). The latter implies the exclusion of costs of any other type; the former does not. The Supreme Court said, and meant, the former. In fact, the Court explicitly left open the possibility that parties who were "compelled" to incur costs—including parties who incurred costs subsequent to government settlements—might proceed under § 9607(a) nonetheless. *Id*.

The second problem with the Bankerts' position is that they have produced no legal authority in support of it. The cases they cite which *did* hold that PRPs who incurred cleanup costs under government settlements were bound to pursue a contribution claim did so because the statutory triggers for contribution claims were met, not because the costs were compelled as opposed to voluntary. *See Niagara Mohawk*, 596 F.3d 112 (holding that the plaintiff had a contribution claim under § 9613(f)(3)(B), because the plaintiff had resolved its CERCLA liability through an administrative settlement); *Appleton Papers Inc. v. George A. Whiting Paper Co.*, 572 F.Supp.2d 1034, 1043 (E.D. Wis. 2008) (dismissing a § 9607(a) cost recovery claim where a § 9613(f)(1) contribution claim was available to plaintiffs by virtue of a previous EPA lawsuit, and noting that "[d]espite the

courts' use of the terms 'voluntary' and 'involuntary' to distinguish between payments recoverable under § 107(a) and those recoverable under § 113(f), the operative principle appears to be that § 107(a) is available to recover payments only in cases where § 113(f) is not."). The cases cited by the Bankerts with different outcomes simply reinforce the straight-forward application of the statutory scheme. *See ITT Indus., Inc.*, 506 F.3d 452 (plaintiff's § 9613(f)(3)(B) claim was dismissed where the AOC did not resolve plaintiff's liability, as would be statutorily necessary to support a § 9613(f)(3)(B) action); *Chitayat v. Vanderbilt Assocs.*, 702 F.Supp.2d 69 (E.D.N.Y. 2010) (dismissing a § 9607(a) claim because, in the court's eyes, the plaintiff never "incurred" costs, as is necessary for a cost recovery action). At least one case directly refutes the Bankerts' argument that costs incurred pursuant to a settlement cannot be recovered under § 9607(a). In *W.R. Grace & Co.-Conn. v. Zotos Intern., Inc.*, 559 F.3d 85 (2d Cir. 2009), a landfill owner brought an action to recover costs it incurred in the investigation and remediation of a contaminated landfill site pursuant to a government settlement agreement. Despite the existence of the settlement agreement, the court held that the plaintiff could recover its cleanup costs under § 9607(a) because neither contribution trigger had occurred. The settlement had not resolved CERCLA liability (§ 9613(f)(3)(B)) and no civil action had been filed (§ 9613(f)(1)). In short, not a single one of these cases treated the voluntary/ compelled costs dichotomy as dispositive.

The third, and most obvious, problem with the Bankerts' argument is that they are asking us to impose

a requirement that appears nowhere in the statutory text. Imposing a requirement not evident on the face of the statute arguably violates fundamental rules of statutory construction. *See E.I. DuPont de Nemours and Co. v. United States*, 508 F.3d 126, 133 n. 5 (3d Cir. 2007). As outlined in detail above, CERCLA does not ask whether a person incurs costs voluntarily or involuntarily. It asks whether a person incurred costs of response consistent with the national contingency plan, whether a person has previously been subjected to a civil action under § 9606 or § 9607(a), and so on. The Bankerts have advanced no persuasive reason, and we can think of none, why we would flatly disregard the terms of the statute and replace them with a new scheme of the Bankerts' choosing, especially one with so little to rec-ommend it in the case law.

### b.  Equating signing a settlement agreement with the resolution of liability

The Bankerts' second argument is that the phrase "resolved its liability . . . in an administrative or judicially approved settlement[,]" as a statutory prerequisite to a contribution suit under § 9613(f)(3)(B), really just means "*entered into* an administrative or judicially approved settlement," even where the settlement may or may not lead to a resolution of liability depending on future events. In its *amicus* brief in support of rehearing, the EPA argued the same. The EPA summarized its argument as follows:

Unlike "discharge," "release," or "satisfy," the word "resolve" is not a term of art in contract law and is not defined in Black's Law Dictionary. Congress therefore did not intend to require a PRP to completely extinguish its liability before obtaining contribution rights. Rather, Congress provided contribution rights to a PRP who "has resolved its liability . . . in an administrative or judicially approved settlement." 42 U.S.C. § 9613(f)(3)(B). Given that context, Congress meant that the settlement agreement needs to resolve a PRP's liability, not that the release, covenant, or other liability-resolving term in the agreement must be effective for contribution rights to arise. In the AOCs, the settling PRPs promised to perform certain removal actions and EPA promised not to sue concerning those actions. The AOCs therefore are "settlement[s]" that resolved the PRPs' liability for response actions within the meaning of [§ 9613(f)(3)(B)] and thus triggered contribution rights upon their effective dates.

The argument, as stated in the passage above and explained in more detail throughout the EPA brief, is not legally persuasive. The EPA ignores traditional rules of statutory interpretation and jumps immediately from its observation that "resolve" is not a "term of art" to a discussion of House Reports and other evidence of legislative intent extrinsic to the statutory text. That path of analysis is not correct.

When a statute itself does not define a term, "we construe the term 'in accordance with its ordinary or natural

meaning,' a meaning which may be supplied by a dictionary." *Carmichael v. The Payment Center, Inc.*, 336 F.3d 636, 640 (7th Cir. 2003) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). This is because "the plain language of a statute is the best evidence of legislative intent." *Senne v. Village of Palatine, Ill.*, 695 F.3d at 597, 612 (7th Cir. 2012) (Flaum, J., dissenting) (citing *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 11 (2008) ("The strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances.") (internal markup omitted)). Of course, while "[w]e frequently look to dictionaries to determine the plain meaning of words," *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000), we always do so with caution, sensitive to the need to consider the meaning of those words in context and to the reality that many words in our language are susceptible of multiple "ordinary or natural" meanings. *United States v. Costello*, 666 F.3d 1040, 1043-44 (7th Cir. 2012); *see also Trs. of Chicago Truck Drivers, Helpers, and Warehouse Workers Union (Indep.) Pension Fund v. Leaseway Transp. Co.*, 76 F.3d 824, 828 (7th Cir. 1996). If the ordinary meaning of a word is totally ambiguous, then resort to legislative materials of the type referenced by the EPA is sometimes warranted. But even then, "where . . . the interpretation urged by [a party] is not supported by common usage, dictionary definition, or court decision, such interpretation cannot be upheld." *Torti v. United States*, 249 F.2d 623, 625 (7th Cir. 1957) (quoting *Gellman v. United States*, 235 F.2d 87, 93 (8th Cir. 1956)). In short, it is what Congress *says*,

not what Congress *means* to say, that becomes the law of the land. Statutory interpretation is therefore an exercise best grounded in the text of the statute itself.

The statute at issue in this case provides some context clues as to the meaning of the phrase "resolved its liability[.]" § 9613(f)(3)(B). First, "resolved" clearly acts as a verb and takes an object—"liability." That eliminates the various dictionary definitions covering "resolve" used as an intransitive verb or as another part of speech entirely. A variety of potential meanings still remain,[12]

---

[12] The Oxford English Dictionary entry on "resolve" is rather extensive, but the section titled "to untie; to answer, solve; to decide, determine" seems most applicable to this statutory context. That section includes, *inter alia*, "[t]o answer (a question); to solve (a problem of any kind); to determine, settle, or decide upon (a point or matter regarding which there is doubt or dispute)"; as well as "to settle (a dispute or argument); to reconcile opposing elements or tendencies within (a conflict, contradiction, etc.)[.]" Oxford English Dictionary, available at http://www.oed.com/. The New Oxford American Dictionary defines "resolve," when used as a transitive verb in a non-specialized context, as "settle or find a solution to (a problem, dispute, or contentious matter)[.]" NEW OXFORD AMERICAN DICTIONARY (Angus Stevenson et al., eds., 3d ed. 2010). Merriam-Webster contains several potentially applicable definitions: (1) to deal with successfully: clear up <*resolve* doubts> <*resolve* a dispute>; (2) to find an answer to; (3) to make clear or understandable; and (4) to reach a firm decision about <*resolve* to get more sleep> <*resolve* disputed points in a text>. Merriam-Webster, available at http://www.merriam-webster.com

(continued...)

but certain commonalities can be discerned. All of them seem to involve the concept of a conclusive determination of some kind. An issue which is "resolved" is an issue which is decided, determined, or settled—finished, with no need to revisit. This sense of the word is consistent with a common sense understanding of its role in the statutory text, and is also consistent with the way the term is regularly used by courts of law in unrelated contexts. *See, e.g., Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012) (question of liability was "resolved" by the district court's determination, at the summary judgment stage, that the defendant was liable); *Shepherd v. C.I.R.*, 147 F.3d 633, 635 (7th Cir. 1998) (suggesting that to "resolve" a taxpayer's liability, in the refund suit context, means to make a final determination of the issue); *Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.*, 987 F.2d 415 (7th Cir. 1993) (noting that plaintiff's "contested liability was resolved" when the Seventh Circuit conclusively found against him in an earlier declaratory judgment action); *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 990 F.2d 342, 344 (7th Cir. 1993) (characterizing a legal claim as "resolved" on summary judgment where it was conclusively decided). The cited cases suggest that, as a matter of common parlance,

---

[12] (...continued)

(entries renumbered to eliminate inapplicable, specialized or obsolete definitions). "Dictionary.com" provides one potentially applicable definition: "to come to a definite or earnest decision about; determine[.]" It also provides "confirm" as a synonym.

courts consider liability to be "resolved" when the issue of liability is *decided*, in whole or in part, in a manner that carries with it at least some degree of certainty and finality.

Accordingly, having surveyed the statutory context, the dictionary definitions, and the common use of similar terms by the federal courts more generally, we believe the "ordinary or natural" meaning of the phrase "resolved its liability . . . in an administrative or judicially approved settlement" is clear and unambiguous. To meet the statutory trigger for a contribution action under § 9613(f)(3)(B), the nature, extent, or amount of a PRP's *liability* must be decided, determined, or settled, at least in part, by way of agreement with the EPA. As a matter of simple, observable fact, that did not happen here. Yes, the Non-Premium Respondents "settled" with the EPA. They agreed to perform certain actions in order to remedy an instance of environmental contamination. But they did not settle the issue of *liability* for that contamination—which is what the statute requires—*at all*. The parties do not need to take this panel's word for it. They can refer to the language which they themselves chose to include in the 2002 AOC:

> Respondents' agreement to comply with and be bound by the terms of this Order and not to contest the basis or validity of this Order or its terms shall not constitute any admission of liability by any (or all) of the Respondents nor any admission by Respondents of the basis or validity of U.S. EPA's findings, conclusions or determinations contained in this Order.

It is very difficult to say, in light of the quoted passage, that the agreement between the parties constituted a resolution of liability.

The attempts by the EPA and the Bankerts to argue otherwise depend on the assertion that "[i]n the AOCs, the settling PRPs promised to perform certain removal actions and EPA promised not to sue concerning those actions." But while the Non-Premium Respondents did indeed promise to perform certain removal actions, the EPA only *conditionally* promised to release the Non-Premium Respondents from liability. The condition which had to be met was complete performance, as well as certification thereof. If the EPA's covenant not to sue is the contemplated "resolution of liability" in this case—and the argument advanced by the EPA and the Bankerts seems to agree that it is—then, by the terms of the AOC itself, the resolution of liability would not occur until performance was complete, which is the first time at which the covenant would have any effect. In fact, the EPA expressly reserved its right to "seek[] legal or equitable relief to enforce the terms of [the] Order" at any time before those covenants went into effect.

Of course, if the EPA had included an immediately effective promise not to sue as consideration for entering into the agreement, the situation would be different. That is exactly what occurred in *RSR Corporation v. Commercial Metals Co.*, 496 F.3d 552 (6th Cir. 2007). In that case, as a term of the AOC, "the United States agreed 'not to sue or take administrative

action' that would impose additional liability on RSR and its co-defendants[.]" *Id*. at 554. As a result, all parties agreed that RSR had resolved its liability through settlement and was therefore entitled to a § 9613(f)(3)(B) contribution action. *Id*. at 556. The Sixth Circuit also agreed, reasoning that "RSR's promise of future performance was the very consideration it gave in exchange for the United States' covenant not to seek further damages. RSR and its co-defendants in other words resolved their liability to the United States by agreeing to assume *all* liability (vis-a-vis the United States) for future remedial actions." *Id*. at 558 (emphasis original).

The Bankerts and the EPA believe this panel's reading of the statute conflicts with the Sixth Circuit's decision in *RSR Corporation*. However, we—like the Sixth Circuit—simply read the statute as requiring that liability be "resolved." Our result differs from the result reached by the Sixth Circuit in *RSR Corporation* not because we apply a contradictory rule of law, but because of the obvious and dispositive differences in the facts. In that case, the consent order contained an immediately effective release from liability. In this case, it did not. In fact, far from immediately resolving all liability, *see* 496 F.3d at 558, our AOC immediately resolved none. So, the consideration in *RSR Corporation* was an immediate release from liability; the consideration in this case was a conditional promise to release from liability if and when performance was completed. Given the nature of the statutory trigger, that distinction clearly warrants a different result—a reality which the Sixth Circuit itself

has openly recognized. *See, e.g., ITT Indus., Inc.*, 506 F.3d at 459-60 (finding that plaintiff had not "resolved its liability" for purposes of § 9613(f)(3)(B) contribution action when plaintiff "has not conceded the question of liability as part of its settlement with the EPA"). The same distinction differentiates this case from *Dravo Corp. v. Zuber*, 13 F.3d 1222 (8th Cir. 1994).[13] There is no circuit split here.

In summary, the efforts of the Bankerts and the EPA to equate the resolution of liability, as a legal proposition, with the simple act of signing a settlement agreement are not persuasive. The ordinary and natural reading of the statute is that a contribution action becomes available when a PRP's liability is resolved—as in decided or determined—through settlement. Whether or not liability is resolved through a settlement simply is not the sort of question which can or should be decided by universal rule. Instead, it requires a look at the terms of the settlement on a case-by-case basis. The parties to

---

[13] In *Dravo*, the EPA entered into a settlement agreement with three PRPs containing an immediately effective covenant "not to sue or to take any other civil or administrative action against" the settlors. 13 F.3d at 1224. The agreement also provided "EPA agrees that by *entering into* and carrying out the terms of this Consent Order, Respondents will have resolved their liability to the United States[.]" *Id*. (emphasis added). The Eighth Circuit placed special emphasis on the agreement's indication that the resolution of liability was based on "entering into" the agreement. *Id*. at 1227. The terms of the AOC at issue in the case before this court are different.

a settlement may choose to structure their contract so that liability is resolved immediately upon execution of the contract. *See RSR Corporation*, 496 F.3d 552; *Dravo*, 13 F.3d 1222. Or, the parties may choose to leave the question of liability open through the inclusion of reservations of rights, conditional covenants, and express disclaimers of liability. *See, e.g., ITT Indus., Inc.*, 506 F.3d at 459-60 (finding that plaintiff had not "resolved its liability" for purposes of § 9613(f)(3)(B) contribution action when plaintiff "has not conceded the question of liability as part of its settlement with the EPA"). In this case, the parties clearly chose to do the latter—a choice which the EPA typically has great weight to influence.

### c.  Policy considerations

The final argument advanced by the EPA and the Bankerts in support of their request for rehearing suggests that this panel's decision creates negative incentives which will discourage PRPs from settling with the EPA in a timely and efficient manner. They argue that it is the possibility of obtaining contribution from non-settling parties as soon as a settlement is executed which incentivizes PRPs to settle in the first place, and that refusing to recognize that right of contribution means a settling PRP will be stuck shouldering the full cost of the cleanup until completion. We are sensitive to such policy considerations, but we are not persuaded that settlement incentives will be negatively effected by our opinion in the way the EPA envisions. True, we

hold that a settling PRP is not entitled to sue a non-settling PRP for contribution under § 9613(f)(3)(B) until the settling PRP's liability is resolved. But we emphatically do not hold that the settling PRP has no legal recourse until that time. As soon as the settling PRP incurs response costs consistent with the national contingency plan, and until liability is resolved, that settling PRP has access to a cost recovery action. What's more, the cost recovery action is subject to a longer statute of limitations, making it arguably the preferable recovery vehicle for a PRP embarking on what might well be a decade-long cleanup effort, and thus actually creating a further positive incentive to settle. That is exactly why the settling PRPs in this case—the very type of people the Bankerts and the EPA claim are disadvantaged by our decision—are arguing in *favor* of classifying their claim as one for cost recovery.

Accordingly, it is difficult to see how our holding, properly understood, has any negative effect on settlement incentives at all. But if any negative incentives are in fact created by deferring the availability of a contribution action, then the EPA can structure its settlements with future PRPs in such a way as to resolve liability effective immediately upon execution. *See RSR Corporation*, 496 F.3d 552; *Dravo*, 13 F.3d 1222. In fact, the EPA's current model AOC has already incorporated provisions to that effect.[14] This opinion has no effect on the validity of such agreements; as already stated, the

---

[14] *See* http://cfpub.epa.gov/compliance/resources/policies/cleanup/superfund/index.cfm?action=3&sub_id=1229

parties to an AOC can structure the resolution of liability in whatever way they see fit, within the bounds of the authority granted by statute. Finally, it must be noted that the Bankerts have spent the entirety of this litigation arguing that giving a settling PRP access to a cost recovery action instead of a contribution action equips the settling PRP with some sort of unfair advantage. They now argue that classifying a settling PRP's claim as one for cost recovery is so remarkably *dis*advantageous to the settling PRP that it jeopardizes future settlement efforts.

### 3. Conclusion of CERCLA Issues

In summary, to the extent that the Trustees seek to recover for costs incurred in executing the 2002 AOC, their action is a cost recovery action. Because the removal action called for by the 2002 AOC was ongoing when this suit was filed, the 3-year limitations period under 42 U.S.C. § 9613(g)(2)(A), quoted in full *supra*, had not yet begun to run, let alone expired.[15] The Trustees' cost recovery action for expenses incurred under the 2002 AOC is timely and must be reinstated for further proceedings at the district court level.

---

[15] In the context of arguing that the Trustees are limited to a contribution claim—which they did not plead—the EPA argues that we should dismiss the claim pursuant to Rule 12(b)(6), rather than on statute of limitations grounds. Since we find that a cost recovery claim *does* exist, however, it is necessary to decide whether that claim is timely.

We recognize that neither party appears to have considered splitting the Trustees' claim in the way that we do now. But the removal actions called for by the AOCs were temporally discrete projects. If that were not the case, the EPA would not have been able to certify the first action's completion before the second action had even been selected. They need not be treated as an indivisible whole. *See United States v. Manzo*, 182 F.Supp.2d 385 (D.N.J. 2000). The removal action contemplated by the 1999 AOC was completed years ago, and supports a contribution action. The removal action contemplated by the 2002 AOC was ongoing at the time this suit was filed, and supports a cost recovery action. Each is governed by a different statute of limitations, and the fact that recovery with respect to the former is time-barred does not legally preclude the Trustees from pursuing recovery with respect to the latter, which is not.

Furthermore, resolving the dispute in this manner does not require constructing a new claim which the Trustees did not plead. Count I, as written, is an action for cost recovery, and we hold that it can stand as an action for cost recovery. This ruling simply limits the damages the plaintiff can recover. The district court is reversed with respect to Count I to the extent that the Trustees may seek to recover for costs incurred pursuant to the 2002 AOC.

Finally, we address the district court's dismissal of Count II, seeking a declaratory judgment of the Bankerts' joint and several liability. Count II is based on 42 U.S.C. § 9613(g)(2), which provides that in any action

for recovery of costs "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." The district court's determination that the Trustees could not bring a cost recovery action obviously rendered § 9613(g)(2) inapplicable. But since we have revived part of Count I, we must revive Count II as well. We do note, however, that the mere fact that the Trustees seek to impose joint and several liability does not mean they will be successful. As we have repeatedly stated, the Bankerts will be given an opportunity to show a reasonable basis for apportionment.

## D. The District Court's Denial of the Trustees' Motion to Strike

According to the Trustees, the Bankerts raised an argument in their summary judgment reply brief which they did not raise in their original motion. More specifically, the Bankerts raised the "contribution bar" argument which we have previously discussed. The Trustees wanted the argument struck, but the district court let it stand. The Trustees now appeal that decision. We review the district court's grant or denial of a motion to strike for abuse of discretion. *Stinnet v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002); *Winfrey v. City of Chi.*, 259 F.3d 610, 618-619 (7th Cir. 2001). "Normally, the decision of a trial court is reversed under the abuse of discretion standard only when the appellate court is convinced firmly that the

reviewed decision lies beyond the pale of reasonable justification under the circumstances*.*" *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000) (citing *Valley Eng'rs v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998), cert. denied, 526 U.S. 1064 (1999)). This is not such a case. In its decision denying the motion to strike, the district court pointed out that the argument was derived from *Atlantic Research* and other cases which the parties did discuss at length in their earlier filings, and that it was raised previously at oral argument. It was therefore not "new" to the case at all. We have no reason to question the district court's representations, let alone to find that they are "beyond the pale of reasonable justification." We find no abuse of discretion on this record.

## II.  Count III: Indiana ELA Claim

We move next to the Trustees' claim under the Indiana Environmental Legal Actions statute ("ELA"). In 1997, the Indiana General Assembly enacted a statute providing for an "environmental legal action" to "recover reasonable costs of a removal or remedial action" involving hazardous substances or petroleum. *See Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009) (citing IND. CODE § 13-30-9-2). The statute became effective on February 28, 1998. In Count III of the Complaint, the Trustees sued under the ELA to recover the costs of the removal actions undertaken pursuant to the 1999 and 2002 AOCs. At the summary judgment stage, the Bankerts argued that an ELA claim was barred by the applicable statute of limita-

tions, and the district court agreed. Once again, we review the district court's dismissal of the claim and its resolution of accompanying legal questions de novo. *Storie*, 589 F.3d at 876; *Stepney*, 392 F.3d at 239.

We apply the statute of limitations of the state whose substantive law governs the claim, which in this case is Indiana. *See Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 110 (1945) (holding that statutes of limitations are considered substantive law for purposes of the *Erie* doctrine). When this action was filed, the ELA did not include its own limitations provision.[16] Accordingly, both

---

[16] That changed in 2011, when the Indiana General Assembly enacted IND. CODE § 34-11-2-11.5. That section states, *inter alia*:

> (b) Subject to subsections (c), (d), and (e), a person may seek to recover the following in an action brought on or after the effective date of this section under IC 13-30-9-2 or IC 13-23-13-8(b) to recover costs incurred for a removal action, a remedial action, or a corrective action:

> (1) The costs incurred not more than ten (10) years before the date the action is brought, even if the person or any other person also incurred costs more than ten (10) years before the date the action is brought.

> (2) The costs incurred on or after the date the action is brought.

If § 34-11-2-11.5 governed this litigation, the resolution of the ELA issue would be a simple affair. But this lawsuit was filed on April 1, 2008, more than three years prior to the section's effective date, and we must apply the limitations period that existed at the time the action commenced. *See*

(continued...)

parties looked elsewhere in the Indiana Code to find an applicable statute of limitations. The Trustees argue that Indiana's ten-year "catch-all" statute of limitations should apply. *See* IND. CODE § 34-11-1-2 (a cause of action which arises on or after September 1, 1982, and which is not limited by any other statute must be brought within ten years). The Bankerts' position has continued to develop throughout the pendency of this appeal, and they now argue two related points. First, the Bankerts argue that the Trustees' ELA claim is a claim for property damage, and should therefore be governed by the six-year statute of limitations for actions to recover damages to real property.[17] Second, whichever statute applies, the Bankerts also dispute—and we must determine—when the limitations period began to run.

---

[16] (...continued)

*Connell v. Welty*, 725 N.E.2d 502, 506 (Ind. App. 2000) (quoting *State v. Hensley*, 661 N.E.2d 1246, 1249 (Ind. Ct. App. 1996) ("the period of limitation in effect at the time the suit is brought governs in an action[.]")).

[17] Found at IND. CODE § 34-11-2-7:

The following actions must be commenced within six (6) years after the cause of action accrues:

(1) Actions on accounts and contracts not in writing.

(2) Actions for use, rents, and profits of real property.

(3) Actions for injuries to property other than personal property, damages for detention of personal property and for recovering possession of personal property.

(4) Actions for relief against frauds.

*See Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996) ("The determination of when a cause of action accrues is a question for the court."). The answer to that question depends on which limitations provision applies, as Indiana courts have held that the time at which a plaintiff's cause of action accrues under each is different.

*Pflanz v. Foster*, 888 N.E.2d 759 (Ind. 2008), explains the application of the ten-year catch-all statute of limitations, and *Peniel Group, Inc. v. Bannon*, 973 N.E.2d 575 (Ind. Ct. App. 2012), explains the application of the six-year property damage statute of limitations. In combination, they provide the framework for the resolution of this case. *Pflanz v. Foster* concerned a dispute between the seller, Merrill Foster, and the buyers, Richard and Dolores Pflanz, of a parcel of land that was previously occupied by a gas station. When Foster sold the land to the Pflanzes in 1984, he advised them that underground petroleum tanks were present on the property, but were not in use and had been closed. 888 N.E.2d at 758. In fact, the tanks were still open and partially filled. *Id*. The Pflanzes first learned as much in 2001, when the Indiana Department of Environmental Management ("IDEM") inspected the property and discovered that the tanks were leaking. *Id*. IDEM ordered the Pflanzes to clean up the property, *see id.* at 759, and the Pflanzes subsequently incurred over $100,000 in cleanup costs. *Id*. at 758. In 2004 and 2006, the Pflanzes filed complaints seeking contribution from Foster. Those complaints were dismissed on statute of limitations grounds, and the issue made its way up to the Indiana Supreme Court.

The Pflanzes' claim was brought pursuant to the Underground Storage Tanks Act (USTA), IND. CODE 13-23-13-1 *et seq.* The USTA is similar to the ELA in that it creates a cause of action for a person who "undertakes corrective action resulting from a release from an underground storage tank, regardless of whether the corrective action is undertaken voluntarily or under an [administrative] order[,]" to recover his expenditures by suing a party responsible for the release. IND. CODE § 13-23-13-8(b)(2). In fact, the two remedies are so substantively similar that the Indiana Code gives plaintiffs aggrieved by a release from an underground tank the option of choosing between the two. *See* IND. CODE § 13-30-9-6; *see also Peniel*, 973 N.E.2d at 581 n.5 (acknowledging the statutory option). Most importantly for our purposes, however, the two are identical to the extent that neither includes its own express statute of limitations. In *Pflanz*, both parties and the Indiana Supreme Court agreed that the ten-year catch-all statute of limitations therefore applied to the Pflanzes' USTA claim. *See* 888 N.E.2d at 758 (citing *Comm'r, Ind. Dep't of Envtl. Mgmt. v. Bourbon Mini-Mart, Inc.*, 741 N.E.2d 361 (Ind. Ct. App. 2000), for the proposition that the ten-year catch-all, as opposed to the six-year limitations period for property damages, applies to an action for "recovery of environmental cleanup costs").[18]

---

[18] The Bankerts seem to argue that the applicability of the ten-year limitations period in *Pflanz* was assumed, rather than decided, due to the agreement of the parties. That cannot be

(continued...)

Next, the Indiana Supreme Court proceeded to deter-
mine when the ten-year limitations period began to run.
Under the Indiana discovery rule, "a cause of action
accrues, and the statute of limitations begins to run, when
a claimant knows or in exercise of ordinary diligence
should have known of the injury[,]" not of the mere
possibility of an injury in the future. *Id*. In cases in which
a party seeks to recover cleanup costs, "the damage [or
injury] at issue is the cleanup obligation assessed by [the
controlling government agency,]" not the mere fact of
contamination. *Id*. The latter would be the injury in a
suit to recover property damages, but suits to recover
cleanup costs are different. *Id*. Following this path to
its logical conclusion, the Indiana Supreme Court
held that in an environmental cleanup case governed
by the ten-year catch-all statute of limitations, the lim-
itations period does not begin to run "until after the

---

[18] (...continued)

correct. Which statute of limitations applies to a claim is a
question of law, and it is long-settled in Indiana that a "conclu-
sion of law" is "beyond the power of agreement by the
attorneys or parties." *App v. Cass*, 75 N.E.2d 543, 395 (Ind. 1947)
(citing *Miller v. State ex rel. Tuthill*, 171 N.E. 381, 384 (Ind. 1930)).
Put even more bluntly, "[t]here is no question that the parties
cannot agree upon the law and force a conclusion according
to their understanding or agreement." *Id*. The Indiana
Supreme Court simply would not have applied the ten-year
catch-all if it was legally incorrect to do so, whether the parties
agreed to it or not. Their decision to honor the parties' agree-
ment therefore amounted to a decision that the limitations
period agreed to was legally correct.

[plaintiff is] ordered to clean up the property." 888 N.E.2d at 759. Since the Pflanzes brought their action within ten years of the cleanup order, their action was timely.

In *Peniel Group, Inc. v. Bannon*, the Indiana Court of Appeals confronted a different kind of claim. The plaintiffs were the current owner and manager of a parcel of real property. After discovering that levels of contamination on the property exceeded limits set by the state, thus requiring a cleanup, the plaintiffs sued the previous owners and tenants of the parcel under the ELA. Since the ELA did not include a limitations provision at the time the suit was filed, the Indiana Court of Appeals was tasked with deciding which other statute of limitations to apply. 973 N.E.2d at 581. Finding that the plaintiffs were the owners of the real property in question and were not themselves responsible in any way for the contamination at the site, the court concluded that the *Peniel* plaintiffs' action was one for property damage. *Id.* at 581-82. That being the case, the six-year limitations period governing actions for damages to real property was applied, and that limitations period begins to run "when a claimant knows, or in the exercise of ordinary diligence should have known of the injury." *Id.* at 582 (quoting *Martin Oil Mktg, Ltd. v. Katzioris*, 908 N.E.2d 1183, 1187 (Ind. Ct. App. 2009). Under Indiana law, "parties are usually held accountable for the time which has run against their predecessors in interest." *Id.* (citing *Cooper*, 899 N.E.2d at 1279). Since the plaintiffs' predecessors in interest knew of the damage to the site more than six years before the action was filed, the Court of Appeals found that the action was barred.

In light of *Peniel*, the Bankerts now argue that the Trustees' claim must likewise be governed by the six-year limitations period for real property damages, since it, too, is brought pursuant to the ELA. But under these circumstances, the *statute* under which the claim is brought does not determine the limitations period. Indeed, it cannot do so, because the statute under which the claim was brought *did not have* a limitations period. That is the root of the problem. What *Peniel* shows is that the underlying nature of the claim is what matters, a principle which is well-established in Indiana law. *See Bourbon Mini-Mart*, 741 N.E.2d 361 ("The applicable statute of limitations is determined by the 'nature or substance of the cause of action.'") (citing *Klineman, Rose & Wolf, P.C. v. North American Lab. Co.*, 656 N.E.2d 1206, 1207 (Ind. Ct. App. 1995), *trans. denied* (1996); *Monsanto Co. v. Miller*, 455 N.E.2d 392, 394 (Ind. Ct. App. 1983)). Specifically, the *Peniel* court found that a property damage claim brought under the ELA—at least, back when the ELA had no independent limitations provision—was governed by the statute of limitations for property damages. That makes sense, given the nature of the claim. But not every ELA claim is one for property damages. In this case, for example, the Trustees have no proprietary interest in Third Site. The Bankerts do. There is no plausible legal theory under which we might find that the Trustees are suing the Bankerts—who are the only parties with a proprietary interest in Third Site—for damages to the real property at Third Site. Neither the "nature or substance" of this ELA claim shows that it is an action for property

damages, and the property damages limitations period therefore does not apply.

Accordingly, the Trustees' ELA claim is not limited by the statute under which it is brought, since no internal limitations provision existed, and it is not limited by the statute applicable to property damage suits, since it is not a suit for property damages. If the action "is not limited by any other statute[,]" *see* IND. CODE § 34-11-1-2(a), then the ten-year catch-all limitations period applies. It makes no difference whether we call the Trustees' ELA claim a contribution action, or a cost-recovery action, or whether we call it by some other name. By the terms of the Indiana Code, where no other statutory limit exists, the ten-year limitations period applies. That is consistent with the Indiana Supreme Court's decision to apply the ten-year period to a generic action for the recovery of environmental cleanup costs in *Pflanz*. *See* 888 N.E.2d at 758. And, once again, it makes no difference that the claim in *Pflanz* was nominally brought under the USTA while this one was nominally brought under the ELA. The "nature and substance" controls, and the two claims are alike in nature and substance. The Trustees are suing "not to recover for damages to their own property, but, instead, to allocate liability for the funds spent [ ] to clean up the environmental contamination of the [Bankerts'] property." *Bourbon Mini-Mart*, 741 N.E.2d 361. Therefore, "[t]he nature or substance of their claim sounds [nearer] contribution or indemnity, and the general ten-year statute of limitations found at IC 34-11-1-2 applies." *Id*.

The ten-year limitations period for an action to recover cleanup costs incurred as the result of an EPA order did not begin to run "until after the [Trustees were] ordered to clean up the property." *Pflanz*, 888 N.E.2d at 759. But the parties' second dispute concerns the application of that rule. There are multiple cleanup orders in this case, each of which inflicted an injury on the Trustees in the form of a cleanup obligation. The Bankerts latch onto the earliest AOC—issued in 1996 to the Trustees' predecessors-in-interest, *see Cooper*, 899 N.E.2d at 734 ("third parties are usually held accountable for the time running against their predecessors in interest[.]") (quoting *Mack v. Am. Fletcher Nat'l Bank & Trust Co.*, 510 N.E.2d 725, 734 (Ind. Ct. App. 1987))—and argue that the limitations period for any ELA claim with respect to Third Site began to run as soon as possible after its issuance.[19] The Trustees, of course, disagree. They concede that the limitations period, with respect to an action to recover costs expended pursuant to the 1996 AOC, began to run on February 28, 1998. The Trustees cannot recover for those expenditures, and they are not trying to do so. But they do not believe that has any effect on the limitations period for

---

[19] The Bankerts rightly note that the limitations period for an ELA claim could not begin to run on the date of the 1996 AOC because the ELA was not yet enacted. Accordingly, they argue that it began to run on February 28, 1998, the date the ELA went into effect, instead. This action was not filed until after February 28, 2008, leading the Bankerts to argue that it is therefore untimely.

recovering the costs of the removal actions mandated by the 1999 or 2002 AOCs. We agree with the Trustees. This action was filed on April 1, 2008, and we find that any injury—meaning, in this context, any costs incurred under a cleanup obligation imposed by the EPA—which occurred subsequent to April 1, 1998, is actionable under the ELA and is not time-barred. This plainly includes the damages suffered through compliance with both the 1999 and 2002 AOCs, which is all the damages the Trustees hope to recover.

The Bankerts' argument fails to persuade us for several reasons. First, the cleanup obligations that the Trustees incurred by executing the 1999 and 2002 AOCs simply were not incurred, either explicitly or implicitly, when the respondents to the 1996 AOC agreed to realign Finley Creek. Neither the Trustees, who did not yet exist in that capacity, nor the 1996 respondents, incurred *any* obligation at that time to engage in removal or remedial efforts at Third Site itself. Generally, parties bringing actions to recover cleanup costs "must wait until after the obligation to pay is incurred, for otherwise the claim would lack the essential damage element." *Pflanz*, 888 N.E.2d at 759 (internal citations omitted). It is true, as the Bankerts and the district court observe, that "it is not necessary that the full extent of the damage be known or even ascertainable but only that some ascertainable damage has occurred" for the statute of limitations to be triggered. *Doe v. United Methodist Church*, 673 N.E.2d 839, 842 (Ind. Ct. App. 1996). But that just means an obligation to pay may be considered an "injury" for statute of limitations purposes even

before it gives rise to an actual monetary loss. It does not, however, support conflating one obligation with another as though they create the same injury, which is what the Bankerts hope to do.

Furthermore, the Bankerts' argument that the statute of limitations began to run with respect to the Trustees' obligations under the 1999 and 2002 AOCs before they incurred those obligations would, if applied to other cases, lead to impractical results. What if the EPA's process had been more drawn out (as is often the case), and the AOCs governing the Third Site cleanup were not issued until 2010, or 2012? According to the argument advanced by the Bankerts, in that case, the statute of limitations would have run entirely on the Trustees' requests for relief before they had even suffered the damages from which relief might be requested. They would have been legally required to bring their action based on nothing but speculation about what sort of cleanup *might* be ordered in the future at Third Site, what it *might* cost, what the present discounted value of those potential future costs *might* be, etc., or else they would lose their right to bring an action at all. The law does not require such clairvoyance. Furthermore, any action that *was* filed under such circumstances would raise serious justiciability concerns, thereby putting plaintiffs who have expended their own resources in redressing environmental harms in between a rock and a hard place. That is not a desirable outcome, but under the Bankerts' understanding of the law it could be a common one.

Finally, before moving on, we note that the Trustees suggested we might certify this issue to the Indiana Supreme Court. In deciding whether certification is appropriate, "the most important consideration guiding the exercise of our discretion is whether we find ourselves genuinely uncertain about a question of state law that is vital to a correct disposition of the case." *Craig v. FedEx Ground Package Sys., Inc.*, 686 F.3d 423, 429-430 (7th Cir. 2012) (citing *Cedar Farm, Harrison Cnty., Inc. v. Louisville Gas & Elec. Co.*, 658 F.3d 807, 812-13 (7th Cir.2011)). "Certification is appropriate when the case concerns a matter of vital public concern, where the issue will likely recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to illuminate a clear path on the issue." *Id*. When considering certification, we are mindful of the state courts' already busy dockets. *Id*. We also consider several factors when deciding whether to certify a question, including whether the issue "is of interest to the state supreme court in its development of state law." *Id*. (citing *State Farm Mut. Auto. Ins. Co. v. Pate*, 275 F.3d 666, 671 (7th Cir.2001)).

We see no reason to certify this question. First, we are not genuinely uncertain about it. While it is not at all a frivolous issue, we are confident in proceeding under the guidance provided by existing Indiana law. Between the settled rule that the nature or substance of an action governs which statute of limitations applies; the fact that this particular action plainly is not one for property damages; and the Indiana Supreme Court's previous

application of the ten-year catch-all under substantially similar circumstances, the appropriate resolution is clear. Second, we cannot say this issue concerns a matter of vital public concern. The remediation of environmental hazards is certainly an issue of public concern, but the limitations issues discussed herein have by this time been resolved conclusively by legislative action in Indiana. The limitations period in effect at the time an action is brought governs that action, *Connell*, 725 N.E.2d at 506, and any future ELA actions will be governed by the independent limitations period legislatively added to the ELA. Accordingly, we can say with certainty that this issue will not reappear in any cases not already pending. Third, the Indiana law question is at most only partially outcome-determinative in this case. To the extent that the ELA claim will allow the Trustees to seek recovery of costs incurred under the 2002 AOC, it is merely duplicative of the CERCLA cost recovery claim we have already reinstated. To the extent that it will allow recovery of costs incurred under the 1999 AOC, it extends farther than the CERCLA claim, but that twist is not enough to offset the lack of genuine concern we have about its resolution, or to independently warrant certification. We move on to Count VIII.

### III. Count VII: Seeking a Declaratory Judgment Against the Bankerts' Insurers

In Count VII of the Complaint, the Trustees seek a declaratory judgment that each of the insurer defendants are obligated to provide insurance coverage, subject to

their respective policy limits, for any liabilities owed by their policy holders to the Trustees. After dismissing Counts I through V on statute of limitations grounds, the district court asked the Trustees and the insurers to report on the status of Count VII. All parties agreed it was moot. Obviously, in light of our reinstatement of the CERCLA and ELA claims, that conclusion is no longer warranted. Count VII is not moot, and we proceed to a consideration of Auto Owners's conditional cross-appeal.

## AUTO OWNERS'S CROSS-APPEAL

Auto Owners Mutual Insurance Company is one of the Bankerts' former insurers, targeted by the Trustees in Count VII of the Complaint. Early in this litigation, Auto Owners filed a motion to dismiss Count VII on res judicata and/or issue preclusion grounds. Auto Owners previously litigated several of the insurance policies in question during the Enviro-Chem Site cleanup in the 1980s and obtained relief in the form of a consent decree and a default judgment. As a result, Auto Owners believes the present claim against it is precluded. The district court treated the motion as one for summary judgment and denied it. To the extent that Auto Owners prevailed regardless when Count VII was dismissed as moot, the final judgment in the case was a favorable one. But they filed a conditional cross-appeal to hedge against a possible reversal, challenging the district court's adverse finding on the preclusion issue. The Trustees responded by challenging the procedural propri-

ety of the cross-appeal and, in the alternative, by
arguing that the district court reached the correct result.
Because we have reinstated the CERCLA, ELA, and
declaratory judgment claims originally dismissed in
the district court's final judgment, we now reach Auto
Owners's conditional cross-appeal.

## Background

Auto Owners is a party to the case because of its role as
a Bankert insurer during the last years of Enviro-Chem
operation. From 1977 until its closure in May of 1982,
Enviro-Chem was located primarily at 865 South State
Road 431, Zionsville, Indiana—referred to earlier in this
opinion as the "Enviro-Chem Site." The Bankert family
owned the site, and Jonathan Bankert, Sr., served as
president of Enviro-Chem. His officers and directors
were Roy Strong and David Finton. Two companies—Pratt
& Lambert, Inc., and Union Carbide Corporation—trans-
ported industrial and commercial wastes to the Enviro-
Chem Site, where they were held in tanks owned by
Wastex Research, Inc. On May 5, 1982, Enviro-Chem
ceased operations, leaving approximately 25,000 drums
and 56 bulk storage tanks at the Enviro-Chem Site. The
drums and tanks were located outside and, unfortunately,
were permitted to deteriorate and release the waste
they contained. In July of 1983, the EPA responded by
authorizing a $3 million cleanup project.

On September 21, 1983, the United States filed a com-
plaint in the Southern District of Indiana against more than
250 defendants, including Enviro-Chem, Jonathan and

Patricia Bankert, Roy Strong, David Finton, Gary Watson,[20] Wastex, Pratt & Lambert, and Union Carbide. The complaint sought to recover EPA response costs and to obtain a declaratory judgment holding the defendants jointly and severally liable for future costs incurred by the United States as it continued to address contamination at the Enviro-Chem Site. On the same day the complaint was filed, Union Carbide and 133 other defendants entered into a consent decree with the government, agreeing to clean up the surface of the Enviro-Chem Site in order to resolve a portion of the government's claim against them. Then, on November 8, 1983, the settling defendants filed a cross-claim against the non-settling defendants, a group which included Enviro-Chem, Jonathan and Patricia Bankert, Roy Strong, David Finton, Gary Watson, and Wastex. The cross-claim sought to recover the approximately $3 million the settling defendants would expend on the surface cleanup, as well as a declaratory judgment that they were not liable for any additional future costs related to cleanup efforts at the Enviro-Chem Site.

While the 1983 lawsuit progressed, another was in the works. Auto Owners had issued several insurance policies to Enviro-Chem, the Bankerts, and two other companies known as Technosolve and Hazardous Materials Management, Inc., during Enviro-Chem's last years of operation. On April 5, 1984, Auto Owners filed

---

[20] Gary Watson served as court-appointed receiver for Enviro-Chem beginning on July 1, 1981.

its own complaint in the Southern District of Indiana, naming the parties on both sides of the cross-claim in the simultaneously pending action as defendants. Auto-Owners sought a declaratory ruling that it owed no coverage for the potential liability of its insureds, pursuant to an exclusion contained in the policies at issue:

> No coverage is provided by this policy for claims, suits, actions or proceedings against the insured arising out of the discharge, disposal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants into and upon land, the atmosphere or any water course or body of water.

Auto Owners's suit was resolved piecemeal. On December 21, 1990, the court entered a default judgment in Auto Owners's favor against Enviro-Chem, Roy Strong, David Finton, Gary Watson, Technosolve, and Hazardous Materials Management. On August 29, 1991, the court entered an agreed judgment between Auto Owners, the Bankerts, Union Carbide, Pratt & Lambert, and Wastex. The default judgment simply incorporated the complaint by reference and granted the relief requested therein, and the agreed judgment stipulated a dismissal without prejudice. In any case, it is undisputed that Auto Owners was successful in avoiding any duty of indemnification attendant to the Enviro-Chem Site litigation. Now, Auto Owners hopes to use the 1990 default judgment and the 1991 agreed judgment to preclude the Trustees from obtaining a declaration of coverage for Third Site.

**Discussion**

The first dispute concerns the propriety of the cross-appeal. The Trustees argue that Auto Owners's cross-appeal should be dismissed because Auto Owners prevailed in the final judgment issued by the district court. Auto Owners argues in response that a conditional cross-appeal is a permissible way to hedge against an adverse finding on the main appeal. Neither party references the actual standard in our Circuit for resolving this sort of dispute. The dispositive question is whether the relief sought in the cross-appeal is different from the relief already obtained by the cross-appealing party in the district court's final judgment. If it is not different, then the cross-appeal must be dismissed. *See Weitzenkamp v. Unum Life Ins. Co. of Am.*, 661 F.3d 323, 332 (7th Cir. 2011) (reiterating the rule that "cross-appeals are not appropriate in routine cases like ours that raise only alternate grounds for affirmance of the judgment and not an independent issue[.]"). On the other hand, "[a]n appellee who wants, not that the judgment of the district court be affirmed on an alternative ground, but that the judgment be changed," for example, from a dismissal without to a dismissal with prejudice, not only should but must file a cross-appeal. *Am. Bottom Conservancy v. United States Army Corps of Eng'rs*, 650 F.3d 652, 661 (7th Cir. 2011).

In this case, the district court did not specify, either in its separate order dismissing count six as moot or in its final judgment, whether the dismissal of count six was a dismissal with or without prejudice. Pursuant to

Federal Rule of Civil Procedure 41(b), "[u]nless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits." A dismissal on mootness grounds is a dismissal for lack of jurisdiction. *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 626 (7th Cir. 2007) ("'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,' the case is (or the claims are) moot and must be dismissed for lack of jurisdiction." (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969))). The case law holds, consistent with Rule 41(b), that a dismissal for lack of subject matter jurisdiction cannot be a dismissal with prejudice. *Murray v. Conseco, Inc.*, 467 F.3d 602, 605 (7th Cir. 2006) (citing *Fredericksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004)). The relief Auto Owners obtained in the district court was therefore a dismissal without prejudice.

The relief Auto Owners requests in its cross-appeal, on the other hand—a dismissal on res judicata grounds—is a dismissal *with* prejudice. Auto Owners seeks a determination that the claims before the court in this case have previously been adjudicated on the merits; res judicata only bars an action if there was a final judgment on the merits in an earlier case and both the parties and claims in the two lawsuits are the same. *See Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co.*, 649 F.3d 539, 547 (7th Cir.2011); *Johnson v. Cypress Hill*, 641 F.3d 867, 874 (7th Cir.2011). Obviously, in contrast to a dismissal

without prejudice, any such determination disposes of the claims before the court permanently. If the Trustees' declaratory judgment claim against Auto Owners cannot be brought in this instance due to an earlier, binding determination of the claim or of the dispositive issues, then it cannot be brought in any future instance without running into the same problem. *See Walliser v. Hannig*, 358 Fed. Appx. 715, 717 (7th Cir. 2009) (referring to a dismissal on res judicata grounds as a "final judgment on the merits"). The relief Auto Owners seeks in its cross-appeal, a dismissal with prejudice, is therefore different from the relief it won in the district court's disposition of the case, which was a dismissal *without* prejudice. A cross-appeal is proper under the circumstances, *see Am. Bottom Conservancy*, 650 F.3d at 661, and we proceed to the merits.

Because the prior decisions—the 1990 default judgment and the 1991 agreed judgment—were entered by the United States District Court for the Southern District of Indiana, we apply federal law to determine their preclusive effect. *E.E.O.C. v. Harris Chernin, Inc.*, 10 F.3d 1286, 1290 n. 4 (7th Cir. 1993) ("Where the earlier action is brought in federal court, the federal rules of res judicata apply.") (internal citations omitted); *see also Havoco of America, Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303, 307 n.6 (7th Cir. 1995). Auto Owners argues both issue and claim preclusion, which are doctrinally related but are subject to different tests. Claim preclusion, which operates to conserve judicial resources and promote finality, applies when a case involves the same parties and the same set of operative facts as an earlier one

that was decided on the merits. *See Matrix IV, Inc.*, 649 F.3d at 547. Issue preclusion, a narrower doctrine than claim preclusion, prevents litigants from re-litigating an issue that has already been decided in a previous judgment. *Hayes v. City of Chi.*, 670 F.3d 810, 814 (7th Cir. 2012) (citing *Matrix IV, Inc.*, 649 F.3d at 547). The district court found that neither doctrine precluded this lawsuit. We review the district court's disposition of these questions de novo, *see Johnson v. Cypress Hill*, 641 F.3d 867, 874 (7th Cir. 2011) ("We review the district court's dismissal of a lawsuit on res judicata grounds de novo."); *Townsend v. Vallas*, 256 F.3d 661, 668 (7th Cir. 2001) ("We review a district court's decision to grant or deny summary judgment de novo."), and we agree.

## I.   Issue Preclusion

We begin by addressing Auto Owners's issue preclusion argument. The doctrine of issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). Issue preclusion requires an identity of issues: "the doctrine 'applies only when (among other things) the same issue is involved in the two proceedings[.]'" *Coleman v. Donahoe*, 667 F.3d 835, 853-54 (7th Cir. 2012) (quoting *King v. Burlington N. & Santa Fe Ry. Co.*, 538 F.3d 814, 818 (7th Cir. 2008)). Additionally,

it is well-settled that issue preclusion, like claim preclusion, only applies if the issue was previously determined by a "valid and final judgment." *Bobby v. Bies*, 556 U.S. 825, 834 (2009).

We need not decide whether the relief obtained by Auto Owners in the 1984 action—a default judgment and a consented dismissal without prejudice—constitutes a "valid and final judgment," and we need not decide whether the coverage issue was "actually litigated" therein. The issue in this case and the issue in that case are not identical. They are not identical because the effects of the pollution exclusion and personal injury provisions of the Auto Owners policies on coverage for contamination at the Enviro-Chem Site and for contamination at Third Site necessarily depend on different sets of facts. True, nobody disputes that Third Site was contaminated as a result of Enviro-Chem operations. But that does not mean that Enviro-Chem's operations at the Enviro-Chem Site and Enviro-Chem's operations at Third Site were identical in all material aspects. As the district court rightly observed, there is substantial—even undisputed—evidence in the record that contamination at Third Site was caused by the release of pollutants at Third Site, and that contamination at the Enviro-Chem Site was caused by the release of pollutants at the Enviro-Chem Site. It may yet turn out that the absolute pollution exclusion—to the extent that most of the policies at issue incorporate it—will prevent the Trustees from recovering against Auto Owners for costs they incurred in cleaning up Third Site. But if so, that will be because the contamination process at Third Site qualified as a

"discharge, disposal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants into and upon land, the atmosphere or any water course or body of water." It will *not* be because the contamination process at the Enviro-Chem Site qualified as the same, and that is what Auto Owners asks us to conclude by finding that the coverage issues involved in the present suit and the prior suit are identical. They are different factual questions, requiring different discovery, etc., and Auto Owners is not entitled to issue preclusion.

## II. Claim Preclusion

Next, we turn to Auto Owners's claim preclusion argument. The doctrine of claim preclusion, also known as res judicata, "applies to bar a second suit in federal court when there exists: (1) an identity of the causes of actions; (2) an identity of the parties or their privies; and (3) a final judgment on the merits." *Kratville v. Runyon*, 90 F.3d 195, 197 (7th Cir. 1996). With respect to the first element, "[a] claim is deemed to have 'identity' with a previously litigated matter if it is based on the same, or nearly the same, factual allegations arising from the same transaction or occurrence." *Id*. at 198. With respect to the second, "[w]hether there is privity between a party against whom claim preclusion is asserted and a party to prior litigation is a functional inquiry in which the formalities of legal relationships provide clues but not solutions." *Tice v. Am. Airlines, Inc.*,

162 F.3d 966, 971 (7th Cir. 1998) (quoting *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995)). It is a fact-specific analysis, and short-hand terms like "virtual representation" are of little to no use in our circuit. *Id*. With respect to the final element, for the purpose of claim preclusion, the traditional rule is that "a judgment on the merits is one which 'is based on legal rights as distinguished from mere matters of practice, procedure, jurisdiction, or form.'" *Harper Plastics, Inc. v. Amoco Chems. Corp.*, 657 F.2d 939, 944 (7th Cir. 1981) (quoting *Fairmont Aluminum Co. v. Comm'r*, 222 F.2d 622, 625 (4th Cir. 1955)).

Regardless of whether the parties are identical or whether the piecemeal resolution of the 1984 litigation qualified as a "final judgment on the merits," claim preclusion is inappropriate because there is no "identity of the causes of action." Federal law defines a "cause of action" as "a core of operative facts which give rise to a remedy[.]" *Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361, 1365 (7th Cir. 1988) (internal citations omitted). Accordingly, the test for an "identity of the causes of action" is "whether the claims arise out of the same set of operative facts or the same transaction." *Matrix IV, Inc.*, 649 F.3d at 547 (citing *In re Energy Coop., Inc.*, 814 F.2d 1226, 1230 (7th Cir. 1987)). "Even if the two claims are based on different legal theories, the 'two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations.'" *Id*. (quoting *Hermann v. Cencom Cable Assocs.*, 999 F.3d 223, 226 (7th Cir. 1993)). The test is an outgrowth of the rule that a party must allege in one proceeding all claims and/or

counterclaims for relief arising out of a single occurrence, or be precluded from pursuing those claims in the future. *Id.*, 840 F.2d at 1365; Fed. R. Civ. P. 13(a). But despite the frequency with which preclusion defenses are raised, "there is no formalistic test for determining whether suits arise out of the same transaction or occurrence." *Ross ex rel. Ross v. Bd. of Educ. of Tp. High School Dist. 211*, 486 F.3d 279, 284 (7th Cir. 2007). "Instead, we have held that courts 'should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds.'" *Id.* (quoting *Burlington N. R. Co. v. Strong*, 907 F.2d 707, 711 (7th Cir. 1990).

Auto Owners's 1984 complaint sought a declaratory judgment that it owed no coverage to the Bankerts or any of their insured corporate entities under the policies listed therein for environmental damages at the Enviro-Chem Site. *Supra*, n. 14. The operative facts underlying the lawsuit were that the Enviro-Chem Site was polluted; that the EPA was engaged in a collaborative process to remedy that pollution; that litigation was underway to distribute liability for the cleanup costs between cooperative and uncooperative PRPs; and that Auto Owners insured the Bankerts and their corporate entities, who had not paid for any of the cleanup despite their PRP status, during several of the years in which the pollution occurred.

Those facts do overlap, to some extent, with the operative facts underlying Count VII in this case. The Trustees seek a declaration of coverage for the same insureds

under the same insurance policies, although they focus on a different coverage provision within the policies. But there are also fundamental differences between the factual background of this suit and the factual background underlying Auto Owners's 1984 complaint. For example, the same factual considerations which barred a finding of issue preclusion come into play here. This coverage dispute concerns whether the pollution activities at Third Site were covered by Auto Owners's policies, while the previous dispute concerned whether the pollution activities at the Enviro-Chem Site were covered by Auto Owners's policies. We need not reiterate why that distinction is important. It is enough to note that it means the claims are not identical; the success of each depends on fitting the facts that led to that contamination to the text of the exclusion provision in the insurance policies. After engaging in such an analysis, the district court could come to the conclusion that Auto Owners *does* owe coverage to the Bankerts for the pollution at Third Site, for example, without in any way contradicting the earlier finding that it does *not* owe coverage at the Enviro-Chem Site. *See Harper Plastics, Inc.*, 657 F.2d at 944 (court looks to "whether the judgment in a second suit would impair rights established under the first judgment" when determining whether causes of action are identical). Again, the district court may well find that the pollution exclusion in Auto Owners's contracts bars coverage for the pollution activities at Third Site, but not on claim preclusion grounds. We affirm with respect to both preclusion issues.

## CONCLUSION

For the reasons stated, we reverse the district court's dismissal of Counts I, II, III, and VII. In Count I, the Trustees have made a timely CERCLA claim, under 42 U.S.C. § 9607(a)(4)(B), to recover costs incurred pursuant to the 2002 AOC. The Trustees' Count II "companion claim" for a declaratory judgment of CERCLA liability is therefore also reinstated. We find that the Indiana ELA claim contained in Count III is timely, and that the declaratory judgment claim contained in Count VII is not moot. The district court committed no abuse of discretion in its handling of the summary judgment briefing process. Finally, we affirm the district court's denial of Auto Owners's motion for summary judgment on preclusion grounds. The Trustees' suit is reinstated and remanded for further proceedings consistent with this opinion.