

FILED

Aug 04 2016, 8:21 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

David L. Hatchett
Michael J. Reeder
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Frank J. Deveau
Melissa A. Gardner
Indianapolis, Indiana

Todd J. Janzen
Brianna J. Schroeder
Indianapolis, Indiana

Dale W. Eikenberry
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Schuchman/Samberg Investments, Inc., *Appellant-Defendant,* | August 4, 2016 |
| | Court of Appeals Case No. 49A02-1508-MI-1051 |
| v. | Appeal from the Marion Superior Court |
| Hoosier Penn Oil Co. Inc., et al., *Appellee-Plaintiff.* | The Honorable Timothy W. Oakes, Judge |
| | Trial Court Cause No. 49D02-0911-MI-51276 |

**Altice, Judge.**

**Case Summary**

In this certified interlocutory appeal, Schuchman/Samberg Investments (SSI) appeals the trial court's order granting summary judgment in favor of defendants Hoosier Penn Oil Company, Inc., Union Oil Company of California, and BP Corporation North America, Inc. (collectively, the Former Operators) on SSI's claims under Indiana's Environmental Legal Actions Statute (ELA) and Petroleum Releases Statute (PRS). Specifically, the trial court ruled that the ELA claim was time-barred and that SSI had not established that it had a right to recover under the PRS. SSI raises the following restated issues on appeal:

1. Did the trial court err in concluding that the ELA claim was subject to the six-year statute of limitation applicable to claims for damage to real property?

2. Did the trial court err in concluding that the statute of limitation applicable to the ELA claim had expired?

3. Did the trial court err in concluding that the PRS did not permit SSI to recover investigation and remediation costs from the Former Operators under the circumstances of this case?

We affirm.[1]

---

[1] We held oral argument in this matter on June 3, 2016. We commend counsel on the quality of their written and oral advocacy.

**Facts & Procedural History**

This case revolves around a piece of environmentally contaminated industrial property located at 850 South Keystone Avenue in Indianapolis (the Site). Historically, the Site has been used for bulk storage of oil and other petroleum products in underground storage tanks (USTs) and aboveground storage tanks (ASTs). Standard Oil owned and operated the Site from the 1920s until 1941, at which time Union Oil took ownership. Union Oil operated the Site until 1975, at which time it was purchased by Carl and Florence Hulen/Hulen Real Estate, LLC (collectively, Hulen). From 1975 until 1978, Hulen leased the property to Univar USA, Inc., which operated a chemical distribution facility and stored large volumes of industrial solvents on the Site. From 1979 until 1995, Hulen leased the Site to Hoosier Penn Oil, which used it to operate a lubricant oil and antifreeze distribution center. In 1995, Hulen sold the property to Wilcher Trucking, Inc. (Wilcher) on contract,[2] and SSI[3] leased the Site from Wilcher. SSI used the Site to operate a metal scrapyard and a diesel fuel storage tank. SSI purchased the Site from Wilcher in 1998.

In 1994, while the Site was owned by Hulen and being leased by Hoosier Penn, Keramida Environmental conducted testing of the soil and groundwater at the Site as part of ongoing negotiations concerning Hoosier Penn's potential

[2] Wilcher obtained title to the Site in 1997.

[3] It was actually SSI's predecessor, Surplus Acquisition and Recycling Consultants of America Inc., d/b/a SARCO, that leased the site. SARCO became SSI around 2004. In the interest of clarity, SSI and SARCO will both be referred to as SSI.

purchase of the Site. Although Keramida did not conduct a full investigation of the Site, it nevertheless discovered contamination in multiple areas of the Site that met or exceeded state and federal standards in effect at the time that would have required remediation. Keramida provided a Corrective Action Plan (the Keramida CAP) to Hoosier Penn, Hulen, and Hulen's attorneys in which it set forth its findings and recommended extensive soil and groundwater testing and remediation. In light of the extent of the contamination and potential investigation and remediation costs identified in the Keramida CAP, Hoosier Penn offered to purchase the property from Hulen for $1, with the understanding that Hoosier Penn would undertake the remedial actions set forth in the Keramida CAP. Hulen refused the offer, and Hoosier Penn relocated its business. In June 1994, Hulen's attorney reviewed the Keramida CAP and sent Hulen a letter setting forth his opinion that no regulatory authority would reasonably require further investigation or corrective action at the Site. No remediation was conducted at that time.

[4] Shortly thereafter, Hulen sold the property to Wilcher. As part of the transaction, Hulen and Wilcher executed and recorded an "Environmental Disclosure Document for Transfer of Real Property" (the Disclosure Document), as was required by applicable law at that time. *Appellant's Appendix* at 325. The Disclosure Document makes repeated reference to an environmental report prepared by Patriot Engineering (the Patriot Report). The Disclosure Document indicated that the transferor had conducted operations on the Site involving hazardous substances, petroleum, and hazardous waste, and

that there were ASTs, USTs, and container storage areas on the Site. The Disclosure Document further indicated that hazardous substances or petroleum had come into contact with the ground at the Site and that soil testing and groundwater monitoring had been conducted at the Site as a result. The Disclosure Document indicated that there were no other environmental defects on the Site, but there was an asterisk next to this representation directing the reader to "see reported soil and groundwater contamination as described in the aforementioned Patriot Report." *Id.* at 333. The drafter of the Disclosure Document answered several questions on the form in the negative, but added language directing the reader to review the Patriot Report. The Disclosure Document, but not the Patriot Report, was incorporated into the deed record available to the public prior to SSI's purchase of the Site. The Disclosure Document indicates that a copy of the Patriot Report is available upon request from Hulen, but the Patriot Report was not designated in this case, and it appears that the parties have been unable to locate it.

[5] On May 8, 1996, an employee of the Marion County Health Department conducted a field inspection at the Site and spoke to Barry Schuchman, one of SSI's principals. In his inspection notes, the investigator noted that removal of an old AST basin and metal tanks had exposed "highly contaminated soil/some pools of fluid on water." *Id.* at 167. The inspection notes indicate that Schuchman informed the investigator that Hoosier Penn would be performing remediation in the area. No such remediation occurred.

[6] Shortly after entering into the lease with Wilcher, SSI entered into negotiations to purchase the Site. Schuchman testified that during those negotiations, Wilcher provided SSI with a copy of a Phase I environmental report that had been prepared in conjunction with Wilcher's purchase of the Site from Hulen (the Wilcher Phase I). According to Schuchman, the Wilcher Phase I was a one-page document that "said the property was clean and there was no problem with the property." *Appellant's Appendix* at 339. The Wilcher Phase I has not been produced in this litigation or designated as evidence.

[7] Schuchman testified further that in 1997, prior to SSI's purchase of the Site, he personally observed stained soil around the former ASTs and that SSI consequently had the top two feet of soil in that area excavated and removed. No testing was done to ascertain the extent of the contamination or to confirm that the excavation was sufficient remediation, and neither SSI nor Wilcher obtained a determination from the Indiana Department of Environmental Management (IDEM) that no further action was necessary.

[8] In June 1998, shortly after purchasing the Site, SSI received a copy of another Phase I environmental report (the 1998 Phase I). The 1998 Phase I provided that the assessment had "revealed no evidence of recognized environmental conditions in connection with the property *except for*" the Site's historical use as a "bulk oil storage area with eight [USTs] and thirteen [ASTs]." *Id.* at 183 (emphasis supplied). The 1998 Phase I further indicated that an environmental assessment had been performed on the Site around 1995, but that the report from that assessment was unavailable at that time. Schuchman testified that

upon receiving the 1998 Phase I, he believed that SSI was "stuck" with a potentially contaminated property. *Id.* at 163.

[9] Another Phase I Environmental Site Assessment was conducted in 2003 (the 2003 Phase I) in conjunction with a possible sale of the Site. The 2003 Phase I noted multiple recognized environmental conditions on the Site, and as a result of the 2003 Phase I and a subsequent Phase II, the potential buyer delayed and ultimately declined to purchase the Site. Subsequent investigations confirmed the presence of extensive environmental contamination at the Site.

[10] On December 20, 2006, IDEM sent SSI a letter directing SSI to conduct an investigation to determine the nature and extent of the contamination and create a report pursuant to Ind. Code § 13-24-1-6. After receiving two investigative reports from SSI, IDEM sent SSI another letter, dated December 16, 2010, instructing SSI to submit a remediation work plan. On December 30, 2011, IDEM approved SSI's remediation work plan and directed SSI to implement the plan. SSI is currently in the process of conducting the work set forth in the plan and has incurred extensive remediation costs.

[11] On November 9, 2009, SSI filed a complaint against Hoosier Penn, Union Oil, BP, and Univar seeking reimbursement for costs incurred and to be incurred in the future by SSI in investigating and remediating the contamination. Specifically, SSI asserted claims under the ELA, the Indiana Underground Storage Tank Act (USTA), and the PRS. On July 3, 2014, the Former

Operators[4] filed a joint motion for partial summary judgment on SSI's claims under the ELA and the PRS. On May 15, 2015, the trial court entered its order granting the Former Operators' motion for partial summary judgment, concluding that SSI's ELA claim was untimely and that the PRS does not provide SSI with a right to recover from the Former Operators under the circumstances of this case. SSI filed a motion to certify the order for interlocutory appeal, which the trial court granted on July 8, 2015. This court accepted jurisdiction on September 4, 2015, and this appeal ensued.

## Discussion & Decision

[12] The standard of review applicable to appeals from summary judgment is well settled:

We review an order for summary judgment de novo, which is the same standard of review applied by the trial court. The moving party must "affirmatively negate an opponent's claim" by demonstrating that the designated evidence raises no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The burden then shifts to the nonmoving party to demonstrate a genuine issue of material fact. In reviewing the record, we construe all reasonable inferences in favor of the nonmoving party. Summary judgment is inappropriate when genuine factual issues persist—that is, when the designated evidence "support[s] conflicting reasonable inferences."

---

[4] Univar did not join in the motion for summary judgment and is not included in the term "Former Operators" for the purposes of this opinion.

*Ind. Restorative Dentistry, P.C. v. Lavens Ins. Agency, Inc.*, 27 N.E.3d 260, 264 (Ind. 2015) (citations omitted).

[13]    The trial court in this case entered extensive findings and conclusions in its summary judgment order.  Although we are not bound by such findings and conclusions, they aid our review by providing reasons for the trial court's decision.  *Allen Gray Ltd. P'ship IV v. Mumford*, 44 N.E.3d 1255, 1256 (Ind. Ct. App. 2015).  We will affirm the trial court's order granting summary judgment on any theory or basis supported by the record.  *Id.*

### 1. The Statute of Limitation Applicable to the ELA Claim

[14]    The ELA does not include an express statute of limitation.[5]  Thus, the threshold issue in this case is what statute of limitation applies to SSI's ELA claim.  The

---

[5] In 2011, the General Assembly enacted I.C. § 34-11-2-11.5, which provides in pertinent part that:

> (b) Subject to subsections (c), (d), and (e), a person may seek to recover the following in an action brought on or after the effective date of this section under IC 13-30-9-2 or IC 13-23-13-8(b) to recover costs incurred for a removal action, a remedial action, or a corrective action:
>
> > (1) The costs incurred not more than ten (10) years before the date the action is brought, even if the person or any other person also incurred costs more than ten (10) years before the date the action is brought.
> >
> > (2) The costs incurred on or after the date the action is brought.

In *Bernstein v. Bankert*, 733 F.3d 190, 217 n.16, 219 (7th Cir. 2012), the Seventh Circuit refers to I.C. § 34-11-2-11.5 as a statute of limitation.  Although this provision appears in a chapter of the Indiana Code titled "Specific Statutes of Limitation," I.C. § 34-11-2-11.5 does not fit that description.  *See* Ind. Code § 1-1-1-5(f) (providing that "[t]he headings of titles, articles, and chapters as they appear in the Indiana Code . . . are not part of the law . . . and are not intended to affect the meaning, application or construction of the statute they precede").  I.C. § 34-11-2-11.5 says nothing of the time frame within which an ELA claim must be brought or the events that trigger the running of that period.  Instead, it imposes a limitation on the types of damages recoverable in an ELA claim in the form of a ten-year look-back period.  In any event, the parties do not dispute that I.C. § 34-11-2-11.5 is inapplicable in this case because SSI's action was commenced prior to its enactment.

Former Operators argue that the six-year statute of limitation applicable to claims for damage to real property set forth in Ind. Code § 34-11-2-7 applies. SSI argues that their ELA claim is one for contribution rather than property damage and, therefore, the ten-year catch-all statute of limitation set forth in I.C. § 34-11-1-2 applies. Finding this court's decision in *Peniel Group, Inc. v. Bannon*, 973 N.E.2d 575 (Ind. Ct. App. 2012), *trans. denied*, controlling, the trial court concluded that the six-year statute of limitation applies to SSI's ELA claim. On appeal, SSI argues that *Peniel* is distinguishable and therefore not controlling and that *Bernstein v. Bankert*, 733 F.3d 190 (7th Cir. 2012), in which the Seventh Circuit distinguished *Peniel* and applied the general, ten-year statute of limitation to an ELA claim, is analogous and persuasive.

[15] The ELA provides that:

> A person may, regardless of whether the person caused or contributed to the release of a hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of a removal or remedial action involving the hazardous substances or petroleum.

Ind. Code § 13-30-9-2.

[16] In *Peniel*, another panel of this court considered whether the six-year or ten-year statute of limitation applied to an ELA claim. The *Peniel* plaintiffs owned and operated a piece of property that had previously been operated as a dry-cleaning business, and they brought an ELA claim against the former owners and

operators seeking to recover costs relating to investigation and remediation of contamination on the property. The defendants filed a motion for summary judgment asserting that the ELA claim was barred by the six-year statute of limitation. The plaintiffs filed a response arguing that their claim was one for contribution rather than property damage and, consequently, the general ten-year statute of limitation applied. *Peniel*, 973 N.E.2d at 576-78.

[17] In reaching the conclusion that the plaintiffs' claim was for property damage as opposed to contribution, the court explained that "[c]ontribution involves the partial reimbursement of one who has discharged a common liability." *Id*. at 581. The court noted that there was no Indiana case law addressing the applicable statute of limitation under the ELA and looked to a federal district court decision, *Taylor Farm Ltd. Liab. Co. v. Viacom, Inc.*, 234 F. Supp. 2d 950 (S.D. Ind. 2002), for guidance. In that case, the plaintiffs filed an ELA claim against Viacom, which had entered into a comprehensive settlement agreement with the EPA requiring it to clean up hazardous waste at a former landfill. The *Taylor* court addressed whether the ELA claim was barred by the Comprehensive Environmental Response, Compensation, and Liability Act's "contribution bar," which provides that individuals who have resolved their liability to the United States via a judicially-approved settlement shall not be liable for contribution claims regarding matters addressed in the settlement. The district court concluded that the ELA "is not, on its face, a contribution scheme" because it "permits 'any person' to sue to 'recover the reasonable costs of a removal or remedial action.'" *Id.* at 962. The district court explained,

"[u]nder the common law of contribution, only a defendant in a lawsuit, or a party who has already been found liable in a previous action may bring a claim for contribution." *Id.* at 972.

[18] Relying on *Taylor*, the *Peniel* court concluded that claims brought under the ELA were not contribution claims:

We cannot say that a claim brought under the ELA is a claim for contribution where it allows a plaintiff who is neither liable for the release of a hazardous substance nor has been found liable, to recover the costs of remediation from another party "without regard to the plaintiff's part in causation of the damage." Accordingly, we find that the ELA is subject to the six-year statute of limitations pursuant to Indiana Code section 34-11-2-7(3) (providing that actions for injuries to real property must be commenced within six years after the cause of action accrues).

*Peniel*, 973 N.E.2d at 582 (footnote and citation omitted).

[19] SSI argues that *Peniel* is distinguishable and directs our attention to *Bernstein*, 733 F.3d 190. *Bernstein* involved a site that had been formerly operated as a waste-handling and disposal facility. The plaintiffs in that action were the trustees of a fund created to finance and oversee the cleanup of the property, and the defendants were former owners and their insurers, none of whom had paid into the trust despite an alleged obligation to do so. Specifically, the defendants had entered into Administrative Orders by Consent (AOCs) with the EPA in 1999 and 2002 pursuant to which they and other respondents agreed to create a trust and fund it to the extent necessary to finance remediation efforts and, in exchange, the EPA conditionally agreed not to sue

the defendants in relation to the environmental contamination. When the defendants did not fulfill their obligations under the 2002 AOC, the trustees sued to recover cleanup costs under the ELA and other statutes. The defendants successfully moved for summary judgment on statute of limitation grounds, and the trustees appealed.

[20] As in this case, the trustees in *Bernstein* argued that the ten-year catch-all statute of limitation applied, while the defendants argued that the six-year property damage statute of limitation applied. In resolving this issue, the Seventh Circuit compared our Supreme Court's decision in *Pflanz v. Foster*, 888 N.E.2d 756 (Ind. 2009), with this court's decision in *Peniel*.

[21] In *Pflanz*, the purchasers of a parcel of land that had previously been operated as a gas station incurred extensive remediation costs after IDEM issued a cleanup order related to leaking USTs on the property. The purchasers brought suit against the former owners under the USTA, and their complaint was dismissed as untimely. Although the parties in *Pflanz* agreed that the general ten-year statute of limitation applied, they disagreed as to what events triggered the running of that period. Noting that the issue was not in dispute, the *Pflanz* court applied the ten-year statute of limitation without analysis and instead focused its attention on the events triggering the running of the statute of limitation.

[22] Despite the lack of analysis on the issue in *Pflanz*, the *Bernstein* court reasoned that application of the ten-year limitation period in that case was decided rather than presumed. According to the *Bernstein* court, "[t]he Indiana Supreme Court

simply would not have applied the ten-year catch-all if it was legally incorrect to do so, whether the parties agreed to it or not. Their decision to honor the parties' agreement therefore amounted to a decision that the limitation period agreed to was legally correct." 733 F.3d at 218, n.18. The *Bernstein* court noted further that although *Pflanz* addressed a USTA claim, the USTA was similar to the ELA in that it creates a cause of action for one who has undertaken environmental remediation to recover costs from the parties responsible for the contamination and does not include its own express statute of limitation. *Id.* at 217-18.

[23] The *Bernstein* court distinguished *Peniel* on the basis that the court in that case "confronted a different kind of claim" because the plaintiffs in that case "were the owners of the real property in question and were not themselves responsible in any way for the contamination at the site[.]" *Id.* at 218. In response to the defendants' argument that the outcome of the case should be controlled by *Peniel* because it addressed an ELA claim, as opposed to *Pflanz*, which addressed a USTA claim, the *Bernstein* court reasoned as follows:

> [U]nder these circumstances, the statute under which the claim is brought does not determine the limitations period. Indeed, it cannot do so, because the statute under which the claim was brought did not have a limitations period. That is the root of the problem. What *Peniel* shows is that the underlying nature of the claim is what matters, a principle which is well-established in Indiana law. Specifically, the *Peniel* court found that a property damage claim brought under the ELA . . . was governed by the statute of limitations for property damages. That makes sense, given the nature of the claim. But not every ELA claim is one for property damages. In this case, for example, the

Trustees have no proprietary interest in [the contaminated site]. The [defendants] do. There is no plausible legal theory under which we might find that the Trustees are suing the [defendants]—who are the only parties with a proprietary interest in [the contaminated site]—for damages to the real property at [the contaminated site]. Neither the "nature or substance" of this ELA claim shows that it is an action for property damages, and the property damages limitations period therefore does not apply.

*Id.* at 219 (citations omitted). Thus, having found that the specific claim set forth by the trustees was not one for property damage, the court determined that the claim fell within the ten-year catch-all statute of limitation set forth in I.C. § 34-11-1-2 regardless of whether the claim was called "a contribution action, or a cost-recovery action, or . . . some other name." *Id.*

[24] SSI attempts to distinguish *Peniel* on appeal. SSI first argues that unlike in this case, the plaintiffs in *Peniel* were fully aware of the contamination before they purchased the property. The Former Operators dispute this interpretation of *Peniel*'s facts, but we need not resolve the disagreement as it is irrelevant to the question of which statute of limitation applies. The date on which SSI became aware of contamination on the Site is pertinent only to the question of when the ELA claim accrued, which will be addressed separately below.

[25] Next, SSI argues that *Bernstein* and *Peniel* both found the question of whether the plaintiff was alleged to have contributed to the contamination relevant to the determination of which statute of limitation applies. Indeed, in discussing *Peniel*, the *Bernstein* court noted that the *Peniel* plaintiffs were the owners of the property and were not themselves responsible for the contamination. SSI

argues that this case "differs materially from the present case" because the Former Operators have alleged that SSI contributed to the contamination. *Appellant's Brief* at 11.

[26] The Former Operators respond that "[a]n affirmative defense raising comparative fault . . . does not in and of itself change the nature of SSI's claim from a cost recovery/property damage claim into one of contribution." *Appellee's Brief* at 14. We agree. Whether the plaintiffs were alleged to have contributed to the damage was not the pivotal factor in either *Bernstein* or *Peniel*—indeed, an apparent similarity between those cases is that in neither case were the plaintiffs alleged to have caused any damage to the property, and this court's holding in *Peniel* was not premised on the plaintiffs' status as innocent purchasers of contaminated property.[6] Rather, the crucial distinction between those cases is that the *Bernstein* plaintiffs had never held any proprietary interest in the contaminated site, while the *Peniel* plaintiffs were the owners and operators of the property at issue. Because the *Bernstein* plaintiffs could not possibly bring suit for damage to property they did not own, the six-year statute of limitation applicable to claims for damage to real property did not apply. The *Peniel* plaintiffs, on the other hand, sought to recover costs relating to the remediation of their own property. Regardless of their role, if any, in causing

---

[6] The *Peniel* court did not discuss whether the plaintiffs had contributed to the contamination in its analysis. It only generally mentioned an ELA plaintiff's potential liability or lack thereof in the context of holding that ELA claims are not on their face contribution claims because the ELA allows a plaintiff to recover costs of remediation without regard to the plaintiff's part in causing the damage. 973 N.E.2d at 582.

the damage to the real property at issue, their claim was inescapably one for damage to that property.

[27] The same is true here. SSI is seeking recovery of costs incurred to remediate its own property. No amount of careful wording or clever analysis can transform what is so plainly a claim for damage to real property into one for contribution. We also note the absurdity inherent in the approach SSI proposes—it would subject an innocent purchaser of contaminated property to a shorter statute of limitation than a property owner who had contributed to the property's damaged condition. Indeed, purchasers could theoretically extend the applicable statute of limitation by releasing hazardous substances onto their own property. We will not endorse such an illogical result. For all of these reasons, we conclude that SSI's ELA claim is, in substance, a claim for damage to real property. *See Cooper*, 899 N.E.2d at 1284 (noting that "[t]he substance of a cause of action, rather than its form, determines the applicability of the statute of limitation"). As such, it is subject to the six-year statute of limitation set forth in I.C. § 34-11-2-7.

## 2. Accrual of the ELA Claim

[28] Having concluded that SSI's ELA claim is subject to the six-year statute of limitation set forth in I.C. § 34-11-2-7, we now turn our attention to the question of when the cause of action accrued. As our Supreme Court has explained,

[u]nder Indiana's discovery rule, a cause of action accrues, and the limitation period begins to run, when a claimant knows or in the exercise of ordinary diligence should have known of the injury. The determination of when a cause of action accrues is generally a question of law. For an action to accrue, it is not necessary that the full extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred.

*Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009) (citations omitted). Moreover, a plaintiff has a duty under the discovery rule to exercise reasonable diligence to discover negligent acts or omissions. *Bambi's Roofing, Inc. v. Moriarty*, 859 N.E.2d 347, 356 (Ind. Ct. App. 2006). Accordingly, a claim will accrue "where the acts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Id.*

[29] The trial court found that the undisputed facts establish that SSI had actual knowledge sufficient to trigger the limitations period in July 1998. We reach the same conclusion. The Former Operators designated evidence establishing that that in May 1996—well before SSI purchased the property—an inspector with the Marion County Health Department observed that removal of an old AST basin and metal tanks had exposed "highly contaminated soil/some pools of fluid on water." *Appellant's Appendix* at 167. The inspector interviewed Schuchman, who stated that Hoosier Penn would be performing remediation in the area. Hoosier Penn performed no such remediation. Moreover, Schuchman testified in his deposition that he was aware that the property had

been used previously as a storage facility for petroleum products and that he had personally observed stained soil in the former AST area before SSI purchased the Site. As a result, SSI had the top two feet of soil in that area excavated and removed, but no follow-up testing was conducted to determine the extent of the remaining contamination, if any. Schuchman testified that "[t]esting should have been done," but that after the soil was excavated, "[i]t looked clean. So as far as we were concerned, it was clean." *Id.* at 404. Schuchman testified further that upon receiving the 1998 Phase I—which indicated that the Site's historical use as a bulk oil storage area with multiple USTs and ASTs was a recognized environmental condition—he believed that SSI was "stuck" with a potentially contaminated property.

[30]    On appeal, SSI argues that Schuchman's observation of surface soil staining was not sufficient to put SSI on notice of potential contamination because the staining was limited to a discrete area that was excavated prior to SSI's purchase of the Site. SSI does not mention, however, Schuchman's own testimony that follow-up testing should have been conducted, but that no such testing occurred because the soil "looked clean." *Appellant's Appendix* at 404. Even if we accept SSI's assertion that Schuchman and SSI subjectively believed the Site was clean based on the Wilcher Phase I and the excavation of the stained soil, we must apply an objective standard in determining the accrual date for its claims. *See Martin Oil Mktg. Ltd. v. Katzioris*, 908 N.E.2d 1183, 1188 (Ind. Ct. App. 2009) (explaining that "we apply an objective standard to the plaintiff's actions, not a subjective one"). We cannot conclude that a visual

inspection by one of SSI's principals following the removal of the stained soil would satisfy a reasonable person in SSI's position that any potential contamination had been abated. Indeed, even Schuchman admitted that "[t]esting should have been done[.]" *Appellant's Appendix* at 404. Under these facts and circumstances, we conclude that by July 1998 at the latest, SSI had knowledge sufficient to trigger its duty to inquire further in order to determine whether a legal wrong had occurred. *See Martin Oil*, 908 N.E.2d at 1188-89. Because SSI filed its ELA claim in November 2009, well outside the applicable six-year statute of limitation, the claim is time-barred.[7]

### 3. Recovery Under the PRS

[31] The PRS gives IDEM the authority to order a property owner or responsible person to undertake remedial action with respect to a release of petroleum at a petroleum facility, I.C. § 13-24-1-1(a), and, under certain circumstances, to undertake remedial action itself. I.C. § 13-24-1-2. Specifically, Section 2 of the PRS provides that IDEM may undertake removal or remedial action if:

(1) the action is necessary, in the judgment of the commissioner, to protect human health and the environment; and

---

[7] Because we conclude that the designated evidence establishes that SSI had actual knowledge sufficient to trigger the running of the six-year statute of limitation by July 1998 at the latest, we need not consider the trial court's conclusions that SSI also had constructive knowledge of the contamination based on the recorded Disclosure Document and that SSI is charged with the knowledge of its predecessors-in-title concerning the contents of the Keramida CAP.

(2) a person cannot be found not later than ninety (90) days after the suspected or confirmed release is identified who is:

> (A) an owner or operator of the petroleum facility or a responsible person; and

> (B) capable of properly carrying out removal or remedial action with respect to the release.

*Id.* Additionally, IDEM may undertake remediation without delay in the event of an emergency. I.C. § 13-24-1-2(c).

[32] Section 4 of the PRS provides that an owner or operator of a petroleum facility is liable to the State for the costs of any remedial action taken pursuant to section 2. I.C. § 13-24-1-2(a). Section 4 also provides a means by which an owner, operator, or responsible party that is liable for the costs of remedial action taken by the State may recover those costs from other responsible parties. Specifically, Subsection 4(b) provides that:

> The owner, operator, or responsible person is entitled to all rights of the state to recover from another responsible person all or a part of the costs described in subsection (a) incurred or paid to the state by the owner, operator, or responsible person in an action brought in a circuit or superior court with jurisdiction in the county in which the release occurred.

[33] The trial court concluded that Section 4 did not permit SSI to recover costs from the Former Operators pursuant to the PRS in this case because "[t]he plain language of the statute limits private recovery to actions taken under Section 2 of the statute and does not extend private actions to Section 6 or any

other section of the statute." *Appellant's Appendix* at 35. Thus, the trial court concluded that SSI had no private right of action under the PRS because "SSI designated no evidence it incurred costs or paid the State for any actions undertaken pursuant to [Section 2.]" *Id.* at 36. In other words, the trial court concluded that because it was SSI that undertook remediation at IDEM's direction, as opposed to IDEM carrying out the remediation itself pursuant to Section 2 and seeking to recover costs from SSI, the PRS did not permit SSI to recover costs from third parties.

[34] On appeal, SSI does not dispute that its right to recover under Section 4 is limited to costs related to action taken under Section 2. However, SSI takes issue with the trial court's interpretation of Section 2(a).[8] SSI argues that "[t]he better and more logical reading is that SSI . . . may perform removal and remedial action work at a non-emergency site when other responsible parties have not stepped up within 90 days, and in that case SSI may via I.C. § 13-24-1-4(b) seek reimbursement" just like IDEM. *Appellant's Brief* at 27.

[35] We note, however, that our notions of what is "better" and "more logical" do not trump the language of the PRS, which is in this case quite clear. Section 4(b) provides that an owner, operator, or responsible person is entitled to recover from other persons all or part of the costs described in section 4(a). Section 4(a) provides that an owner, operator, or responsible party is liable to

---

[8] SSI makes no argument that action was taken pursuant to the emergency provision of Section 2(c).

the state for the costs of remedial action taken under section 2. In turn, section 2 sets forth the circumstances under which the state may undertake remedial action with respect to a petroleum facility release. These sections work together to demonstrate that the PRS extends a limited right of recovery to private parties. It allows an owner, operator, or responsible party to recover from another responsible party where *the State* has incurred remediation costs pursuant to section 2 and passed those costs on to the owner, operator, or responsible party seeking recovery. Because IDEM did not incur remedial costs pursuant to section 2 of the PRS, and consequently passed no costs on to SSI pursuant to section 4(a), SSI cannot recover from other responsible parties pursuant to section 4(b).

[36] Because we find the language of the PRS clear and unambiguous, we may not engage in judicial construction. *See Siwinski v. Town of Ogden Dunes*, 949 N.E.2d 825, 828 (Ind. 2011) (noting that "[i]f a statute is clear and unambiguous on its face, no room exists for judicial construction"). Nevertheless, we note that we are unpersuaded by SSI's argument that a broader construction is necessary to prevent the absurdity of "requir[ing] property owners to thumb their noses at IDEM upon receipt of a [PRS] demand, lest that property owner get stuck holding the bag when it tries to pass on some or all of its costs to 'another responsible person.'" *Appellant's Brief* at 28. This argument presumes that the PRS is the only means by which property owners may recover remediation costs relating to a petroleum facility release from other responsible parties. This is simply not the case. The ELA allows an owner of property contaminated by

a petroleum facility release to bring an action to recover remediation costs from another person that caused or contributed to the release. *See Cooper*, 899 N.E.2d at 1281 (noting that the ELA "overlaps in some ways" with the USTA and the PRS). We are not at liberty to construe the PRS more broadly than its language allows so as to relieve SSI of the consequences of its failure to file its ELA claim within the applicable limitation period.

## Conclusion

[37] For all of these reasons, we conclude that the trial court correctly concluded that SSI's ELA claim is time-barred and that the PRS does not provide SSI with a right to recover from the Former Operators under the circumstances of this case. Accordingly, we affirm the trial court's partial summary judgment order on those claims.

[38] Judgment affirmed.

[39] Robb, J. and Barnes, J., concur.